UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert Vance WALTON,
Defendant-Appellant.

No. 85–2903.

United States Court of Appeals,
Seventh Circuit.

Argued May 14, 1986.

Decided March 3, 1987.

Arthur Lerner, Greaves Lener & Kirchner, Champaign, Ill., for defendant-appellant.

Thomas E. Karmgard, Asst. U.S. Atty., Paul L. Kanter-U.S. Atty., Danville, Ill., for plaintiff-appellee.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Defendant-appellant Robert Vance Walton was convicted by a jury in September, 1985 of the armed robbery of the National Bank of St. Anne, St. Anne, Illinois (hereinafter St. Anne's Bank). He received a sentence of 25 years of imprisonment, to be served consecutively to any outstanding sentences. Walton raises several arguments on appeal. We find them all without merit and therefore affirm his conviction.

A jury could have found the following facts from the evidence presented at trial. In September, 1976 Walton and co-defendants Harris, Curtis and Williams met at Walton's apartment to plan the robbery of St. Anne's Bank. A second meeting was held a month later in October, 1976. On November 18, 1976 the group performed practice runs between St. Anne's Bank and an abandoned trailer on the outskirts of town. Later that day, Walton, Williams,

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

Harris and Carver went to Walton's apartment to secure some ammunition.

On November 19, 1976 Walton and the others met at the abandoned trailer. Subsequently, they drove to an area outside the town of St. Anne known as Eldorado Terrace, which was to be used as a switch site for exchanging cars after the robbery. At this point, at approximately 1:30 P.M. on November 19 co-defendants Harris, Williams, Goodman and Carver left Eldorado Terrace for St. Anne's Bank. Walton and Curtis remained at the switch site. Thereafter, Williams, Goodman and Carver robbed St. Anne's Bank. Money was taken from teller counters and the bank vault. When Williams, Goodman and Carver left the bank premises and returned to the get-away car, a private citizen recorded the license plate number. Harris then drove the get-away car to Eldorado Terrace where defendants Walton and Curtis were waiting. At this point Williams, Goodman and Carver entered the switch cars. However, when Harris tried to enter Walton's car, Walton pointed a gun at him. The switch cars left with Harris remaining behind.

Harris returned to the get-away car and pursued Walton. Yet at approximately 2:50 P.M. Illinois State Trooper Timothy Nunn observed Harris in the get-away car and stopped and arrested Harris. Thereafter, Harris was questioned by Special Agent Oren Lucas of the FBI. At first Harris implicated all the co-defendants except Walton. On the following day, however, Harris implicated Walton's involvement in the robbery. It was later determined that St. Anne's Bank was robbed of $76,655.50. The Bank was insured by the Federal Deposit Insurance Agency.

A search warrant was issued on November 23, 1976 which authorized the search of Walton's apartment. There is some conflicting testimony as to whether co-defendant Williams also lived at this apartment. Co-defendant Goodman claimed he did; Williams denied this. In any event, the search warrant issued authorized a search for:

... certain property, namely United States Currency, Sawed-Off Shotguns and other weapons, Ski-masks, fictitious identification, and other evidence which are property that constitutes evidence of the commission of a criminal offense, fruits of crime, things criminally possessed, and property used as the means of committing a criminal offense, including Title 18, United States Code, Sections 2113(d), 1073 and 922, et seq.

The search warrant was executed by FBI agents on November 24. Many incriminating items were found including three packs of twenty dollar bills with serial numbers matching the serial numbers on a bait-money list. The packs of bills were wrapped with a strap labeled "National Bank of St. Anne." There was also a unique one hundred dollar bill found which was identified by a teller at the bank named Kershaw. Additionally, a hand-drawn diagram of the interior of St. Anne's was discovered as well as a map of the area surrounding the bank. Finally, ammunition was discovered for a .357 Magnum, a .38 handgun and for shotguns.

Walton's first argument is that he was denied his rights under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Walton was originally indicted for the November, 1976 robbery on December 7, 1976. His whereabouts were unknown to the government until at least January, 1978 (according to Walton) or quite possibly not until January, 1980 (according to the government). Regardless, the government did not know Walton's whereabouts until the State Department in Washington received a telegram from the American Embassy in Stockholm, Sweden. The telegram reported Walton had been arrested and was being tried for the smuggling and possession of narcotics and unauthorized possession of a firearm. In July, 1980 Walton was convicted and sentenced to eight years imprisonment in Sweden. His conviction was affirmed by the Stockholm Appeals Court in November, 1980.

Citing *United States v. McConahy,* 505 F.2d 770 (7th Cir.1974) Walton claims the government did not proceed in good faith

and with due diligence to secure his release from Swedish authorities. Walton asserts the government's failure to bring him to trial before September, 1985 deprived him of his right to a speedy trial. Consequently, Walton filed a motion for discharge pursuant to 18 U.S.C. § 3161 in the district court. The lower court denied the motion and Walton believes this was error. We respectfully disagree.

■ The case law is relatively scarce concerning what constitutes "due diligence" under the Speedy Trial Act when a criminal defendant is being held in a foreign country. However, there is no case law to support Walton's argument, which in essence is that absent a formal request for extradition from one government to another, there has been no diligent good faith effort. *McConahy* does not support such a conclusion as Walton suggests. The case is easily distinguishable from ours. In *McConahy*, the defendant was located in Britain, serving a five year term of imprisonment. After review of the relevant facts, we concluded the government, "... made no effort whatsoever and simply ignored McConahy's requests that he be returned here for trial." 505 F.2d at 773–774. In contrast, in the case at bar we do have evidence the government made an effort to secure Walton. First, there is evidence that Murray Stein, Associate Director of the Office of International Affairs at the Department of Justice contacted Mats Elqquist of the Swedish Foreign Ministry in Stockholm to ask about Walton's chances of being extradited to the United States. Stein has been in his position and involved in such procedures at least since 1976 (see *United States v. Salzmann*, 548 F.2d 395, 405 (2d Cir.1976)). Stein reports he was told that the Swedish government

did not want to release Walton until he served his sentence for his Swedish conviction. Additionally, there is documentary evidence from State Department files revealing that in August, 1982 informal exchanges occurred between relevant officials from both the United States and Sweden. The evidence reveals Swedish officials once again indicated no interest in extraditing Walton (see appendix).

We note that during this time period the relevant part of the extradition treaty between the United States and Sweden read:

When the person sought is being proceeded against in accordance with the criminal laws of the requested State or is serving a sentence in that State for an offense other than that for which extradition has been requested, his surrender may be deferred until such proceedings have been terminated or he is entitled to be set at liberty.

Article IV, Convention on Extradition between the United States of America and Sweden, 14 U.S.T. 1846 (1963).[1]

Hence we conclude relevant treaty language clearly left the extradition question to the discretion of appropriate officials in Sweden. We also conclude from the efforts outlined above that the government exercised good faith and due diligence in attempting to extradite Walton and was justified in concluding, after being rebuffed twice, that it would have to wait until Walton served his Swedish sentence before he would be returned to the United States.

No case law holds, as Walton suggests, that a formal request for extradition must be made before due diligence can be found to have existed for purposes of the Speedy Trial Act. Indeed, in *United States v. Bagga*, 782 F.2d 1541 (11th Cir.1986), the Elev-

---

**1.** Under Section 11 of Swedish extradition law, Swedish officials are similarly granted discretionary authority as to whether extradition of a foreign citizen convicted of Swedish charges should be effectuated:

*Section 11:* A person who is prosecuted in Sweden for another offence punishable by imprisonment or who according to the sentence passed on him shall undergo such punishment or be otherwise deprived of liberty may not be surrendered as long as the impediment exists.

The same rule shall apply if he is under examination for such an offence.

Notwithstanding the provisions of the preceding paragraph extradition *may* be granted for the purpose of legal proceedings in respect of the offence for which the foreign state has requested extradition, on the condition that the person extradited shall later be surrendered to the Swedish authorities in accordance with a decision of the Government. (Emphasis added).

enth Circuit recently remarked, "It is true that Bagga's absence from the country did not relieve the government of its obligations to make good-faith efforts to have him returned. But such efforts do not require the government to pursue futile legal gestures." 782 F.2d at 1543 (Footnotes omitted). We refuse to equivocate due diligence with a formal extradition request, although we warn the due diligence factor should be adjudicated on a case by case basis taking into account the totality of the circumstances.[2]

Walton raises two final arguments both of which can be dismissed rather quickly. First he claims certain allegedly extraneous evidence obtained by the police pursuant to an admittedly valid search warrant should have been suppressed. The search warrant delineated, as outlined above, that the following items were to be seized:

> ... certain property, namely United States Currency, Sawed-Off Shotguns and other Weapons, Ski-masks, fictitious identification, and other evidence which are property that constitutes evidence of the commission of a criminal offense, fruits of crime, things criminally possessed, and property used as the means of committing a criminal offense, including Title 18, United States Code, Sections 2113(d), 1073 and 922 et seq.

Walton claims the United States Currency, maps and other materials not explicitly mentioned in the warrant (such as photo albums and notebooks) should have been suppressed as products of an unnecessarily broad blanket or exploratory search.

■ We find no merit in this argument. Walton does not argue police entered unauthorized areas of the apartment to find any of these items. He fails to allege the "other evidence" was not in plain view, which would be another indicator the search may have been too expansive. While Walton asserts the serial numbers of the United States Currency seized were not explicitly enumerated in the warrant and that this was error, considering the police found the money wrapped in a strap labeled "National Bank of St. Anne," we deem this argument farcical. The money was obviously the fruit of the crime and seizable at this point. In sum, most of the items not explicitly delineated in the warrant were so obviously related to the crime that, absent an allegation they were seized in unauthorized areas or not subject to plain view, they were quite properly seized. Items in this category include, for example, the diagram of the interior of St. Anne's Bank and the map of the area surrounding the bank. Further, any items not obviously related to the crime but seized (letters, photo albums, notebooks) were not needed to sustain the conviction and therefore, assuming *arguendo* their admission into evidence was error, it was harmless error when one reviews all the incriminating evidence properly seized and admitted. We need not engage in any further discussion of Fourth Amendment law as it relates to this case for Walton fails to allege any serious breaches that could have occurred.

■ Walton's final argument is that there was insufficient evidence to support his conviction. He claims this is because there was no direct evidence of his involvement. Further, he claims the strongest evidence implicating his involvement came from Jerry Lee Harris, a convicted robber. Harris was apparently the only person to directly implicate Walton's involvement in the robbery. Walton also asserts in his sufficiency argument that there was no incriminating evidence found in his bedroom. First, merely because most of the evidence against Walton was circumstantial does not mean that the conviction should be clouded in an air of suspicion. As stated in *United States v. Henderson,* 693 F.2d 1028 (11th Cir.1982), "The test for evaluating circumstantial evidence is the same as in evaluating direct evidence ...

---

**2.** We recognize a temporary transfer provision was created as of September 27, 1984 which on its face is helpful to Walton. However, as the government points out, by the time of the passage of the provision, Walton had only a few months left in his sentence. The temporary transfer provision was designed for persons serving terms of imprisonment of ten years or longer. Therefore, the provision was not applicable to Walton's case by the time it was enacted.

Circumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt." 693 F.2d at 1030. Secondly, the fact that Harris was convicted of a prior crime does not mean a jury should not be able to hear his testimony. Harris' prior criminal conduct goes to the weight or veracity of his testimony, not to its admissibility. Walton's counsel had a sufficient opportunity to impeach Harris and a jury was entitled to hear what he had to say as to Walton's participation in the robbery. As for Walton's final point, considering the incriminating evidence found in Walton's apartment, viewing the evidence in a light most favorable to the government, there is sufficient evidence to sustain a conviction regardless of any lack of proof the evidence was found in Walton's bedroom.

AFFIRMED.

## APPENDIX

*Department of State*     TELEGRAM

STOCKM 93515 2709192

OCT-00   COPY-01 ADS-00   EUR-00   PPT-01 ————————139263 2730122 /13

DEPARTMENT OF STATE A/CDC/MR

P 251842Z AUG 82
FM AMEMBASSY STOCKHOLM
TO AMEMBASSY LONDON
INFO SECSTATE WASHDC 6319

REVIEWED BY _____ DATE 8-13-8

C O N F I D E N T I A L STOCKHOLM 3515

LONDON FOR LEGATT

E. O. 12356: DECL: 8/25/87
TAGS: CGEN, CARP (WALTON, ROBERT VANCE)
SUBJECT: POSSIBLE EARLY RELEASE OF ROBERT VANCE WALTON

REF: A) LONDON 18557 (NOTAL) B) LONDON 8685 (NOTAL)

PDS or IDS NEXT. DATE
TS AUTH. _F.S._ REASON(S) _____
EXEMPT EXISTING MARKINGS ☐
DECLASSIFIED/RELEASABLE ☐
RELEASE DENIED ☐
3A or FOI EXEMPTIONS _____

1. (C) ENTIRE TEXT.

2. CONSOFF HAS INFORMALLY DISCUSSED A POSSIBLE EARLY RELEASE FOR WALTON WITH APPROPRIATE SWEDISH AUTHORITIES IN THE SWEDISH MINISTRY FOR FOREIGN AFFAIRS AND PRISON ADMINISTRATION. THEY HAVE UNEQUIVOCALLY STATED THAT SWEDEN IS NOT INTERESTED IN SENDING MR. WALTON TO THE UNITED STATES UNTIL HE HAS COMPLETED HIS FULL TERM.
3. A FAIRLY RECENT CHANGE IN SWEDISH LAW WOULD MAKE MR. WALTON ELIGIBLE FOR RELEASE AFTER SERVING ONE-HALF OF HIS EIGHT YEAR SENTENCE. FROM THE TIME OF HIS ARREST, THE FOUR YEAR PERIOD WOULD EXPIRE IN DECEMBER 1983. HOWEVER, CONSIDERING THE FACT THAT MR. WALTON WAS CONVICTED IN A MAJOR NARCOTICS CONSPICARY AFTER ARRIVING IN SWEDEN AS A FUGTIVE CONVICTED MURDER, SWEDISH AUTHORITIES DOUBT THAT HE WOULD BENEFIT FROM THE NEW MORE LIBERAL PROCEDURE. MR. WALTON IS MORE LIKELY TO BE RELEASED AND DEPORTED TO THE UNTIED STATES AFTER SERVING APPROXIMATELY TWO-THIRDS OF HIS SENTENCE—THAT IS, SOMETIME IN EARLY 1985.
4. COMMENT: BASED ON OUR PAST EXPERICENCE IN SIMILAR CASED AND THE RESPONSE TO OUR FORMAL INQUIRIES, WE DO NOT BELIEVE THAT A FORMAL REQUEST FOR EARLY RELEASE/DEPORTATION WOULD BE APPROVED AND DO NOT RECOMMEND THAT A FORMAL REQUEST BE MADE IN THIS CASE.
5. FYI: WE BELIEVE THAT THE CHANCES OF WALTON BEING RELEASED FROM SWEDISH CUSTODY AND RETURNING TO THE UNITED STATES WITHOUT OUR PRIOR KNOWLEDGE OR FLEEING TO A THIRD COUNTRY ARE EXTREMELY REMOTE. HE WAS TRAVELING ON A FRAUDULANT U.S PASSPORT

WHEN ARRESTEDM SINCE THIS PASSPORT WAS RETURNED
TO US. CANCELLED, AND RETURNED TO THE PASSPORT
OFFICE ON MARCH 4, 1981. THE SWEDISH AUTHORITIES
MUST REQUEST A PASSPORT ON MR'S WALTON'S BEHALF PRIOR
TO HIS RELEASE. IN PAST CASES WHEN U.S. CITIZENS
HAVE BEEN SENTENCED TO PRISON FOLLOWED BY DEPORTA-
TION, THEY WERE KEPT IN CUSTODY UNTIL TAKEN
TO THE AIRPORT UNDER GUARD TO BE ESCORTED TO THE
UNTIED STATES BY TWO SWEDISH POLICE OFFICERS  GIVEN
THE NATURE OF HIS OFFENSES IN SWEDEN AND PRIOR
CRIMINAL RECORD, IT IS VERY LIKELY THAT THIS PROCEDURE
WILL BE FOLLOWED WHEN MR. WALTON IS RELEASED FROM
PRISON AND DEPORTED TO THE USA. FORSBERG

UNCLASSIFIED

~~CONFIDENTIAL~~