**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jorge E. MARIN, Defendant–Appellant.**

No. 92–2755.

United States Court of Appeals, Seventh Circuit.

Argued May 6, 1993.

Decided Oct. 20, 1993.

Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, Scott A. Verseman (argued), Rockford, IL, Robert Christopher Cook, Chicago, IL, for U.S.

Walter Jones, Jr., Jorge V. Cazares (argued), Pugh, Jones & Johnson, Chicago, IL, for defendant-appellant.

Before CUDAHY, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Jorge Enrique Marin was indicted on three counts of participation in a cocaine distribution scheme in Chicago, Ill. Count One charged him with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846; Count Two charged him with a violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 for possessing with intent to distribute cocaine on August 24, 1990; and Count Three charged him under the same statutes with possession with intent to distribute cocaine on January 16, 1991. On April 2, 1992, a jury found Marin guilty of Counts One and Three, and not guilty of Count Two. He was sentenced to a five-year prison term on Count One, to be followed by a five-year period of probation on Count Three, and ordered to pay a special assessment of $100.

We affirm.

## I. Background

Jorge Enrique Marin ("Marin") had been a longtime drug dealer and Samuel Gibson's ("Gibson") supplier before Gibson took a short hiatus from drug dealing to pursue a partnership interest in financially troubled A-1 Fire and Security Systems ("A-1") in Chicago, Ill. In May 1990, Marin and Gibson had a chance meeting at a railroad crossing in Hammond, Indiana. During this meeting, Marin inquired of Gibson about whether there were any opportunities for employment at A-1 and offered to resume supplying Gibson with cocaine.

Sometime later in the month, Marin met with Gibson at A-I's offices and once again inquired about employment opportunities, suggesting that it would be helpful to have evidence of employment in the event he were stopped by the police. Saying he would "take care of that," Gibson introduced Marin to one of his partners, Robert Warren ("Warren"), who offered Marin a job as a salesperson. Shortly thereafter Gibson had A-I business cards printed for Marin and supplied him with a telephone pager.[1]

Several days later, Gibson advised Warren that, since A-I was encountering financial difficulties, he was considering the possibility of dealing drugs to raise money. Warren contacted his brother and his corporate attorney with this information. A few days later, Gibson, while in his office, displayed some cocaine to Warren. After observing the coke, Warren notified the Illinois State Police and agreed to cooperate with them and the FBI in an investigation of Gibson's activities.

Marin subsequently supplied Gibson with an eighth of a kilogram of cocaine, and Gibson suggested that Warren help him find other drug users. On August 23, 1990, Warren complied and advised Gibson that he had a customer who wanted an ounce of cocaine.

1. Gibson testified at trial that Marin's "employment" was a ruse, as Marin never performed any work whatsoever for A-I.

At this time Warren was cooperating with the police, and the "customer" turned out to be an undercover Illinois State Police officer named Mark Henry ("Henry"). The next day, Gibson, Warren and Henry met and Gibson sold Officer Henry an ounce of cocaine for $1,300. A short time later, Marin went to Florida for several months and returned to Chicago with four kilograms of cocaine that he and Gibson proceeded to sell in a single day.

Officer Henry planned another undercover buy and arranged for Warren to call Gibson and tell him that Henry wanted another half kilo of coke. Gibson called Marin and made the necessary arrangements for the January 16, 1991, sale.

On the prearranged date, Gibson met with Warren and Henry in a parking lot in Hickory Hills, Illinois. Gibson explained that there would be a slight delay because he was waiting for "George" (Marin's nickname). Marin paged Gibson and arranged to meet at a nearby gas station, where he told Gibson that, because he suspected that Warren was a police officer, he would not go to the drug deal in person. Gibson went alone. Marin waited in Gibson's car, while Gibson drove Marin's red Toronado to the nearby parking lot where he consummated the drug deal with Henry for $16,000. After the sale, Marin and Gibson met, split the profits, and departed in their own respective vehicles.

Marin supplied Gibson with another quarter kilo of cocaine on two more occasions, and subsequently the two had a number of meetings and telephone conversations during which Marin demanded payment from Gibson for unpaid cocaine shipments.

Meanwhile, Gibson also met with Warren, who had expressed concern about Marin's absence from the January 16 sale. Gibson explained that because Marin feared that Warren was a cop, he had refused to appear and set up certain precautions to avoid appearing at the drug sale in person.

Finally, Officer Henry, still undercover, offered Gibson $30,000 for another kilogram of cocaine. Gibson agreed, and began price-shopping among his suppliers. Marin quoted him a price of $26,000, but Gibson decided to buy instead from another supplier who charged only $23,000. Gibson was arrested after he resold this kilo to Officer Henry on May 16, while Marin was arrested at his residence on the following day.

On May 17, a criminal complaint was filed in district court charging Marin with one count of having possessed cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). On June 24, 1991, the government moved the court under 18 U.S.C. § 3161(h)(8)(A) to extend the time period for the filing of an indictment by sixty days, and the presiding judge after a hearing granted the motion. On August 28, the government returned a single-count indictment charging Marin with possession of cocaine with intent to distribute.

A superseding indictment was returned on December 11, 1991, charging Marin with one count of conspiring to distribute cocaine from July 1990 to May 16, 1991, and two counts of possession of cocaine with intent to distribute on August 24, 1990, and on January 16, 1991.

## II. Issues

Marin raises four issues on appeal. First, he contends that the trial judge abused his discretion by excluding 60 days from the time requirement that an indictment be filed under the Speedy Trial Act. Second, the defendant alleges that the district court violated his right to equal protection when it permitted the government to use a peremptory strike to remove a Hispanic from the jury. Third, he argues that the evidence was insufficient to sustain the jury's guilty verdicts. Finally, Marin claims that the district court committed clear error when it admitted certain co-conspirator statements in evidence at trial.

## III. Speedy Trial Act

■ The Speedy Trial Act requires the government to file an information or indictment within thirty days of the defendant's arrest. 18 U.S.C. § 3161(b). The statute also specifically provides for the exclusion of certain periods of delay in the computation of the timeframe within which an indictment must be filed. 18 U.S.C. § 3161(h). This section provides that a delay may be allowed

upon a judge's finding that "the ends of justice served by [granting a continuance] outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). Among the factors a court must consider in determining whether to grant an extension under this "ends of justice" exception are the two factors that the government contends justify the continuance it was granted in this case: (1) "Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice," and (2) "[w]hether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the [time] period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex." 18 U.S.C. § 3161(h)(8)(B)(i) and (iii).

In support of its application for an extension, the government informed the court that the defendant was the primary source of cocaine for Gibson, and that Gibson was cooperating with the government in Marin's case as well as in other ongoing investigations. Furthermore, the government pointed out that because its investigations were continuing, it would be unable to present its evidence to the grand jury within thirty days.

In addition, the government informed the court that the early return of an indictment might threaten the safety of Gibson, Gibson's family, as well as the law enforcement officers engaged in this and other ongoing investigations. The government also advised the court that its investigation into Gibson's activities[2] included a financial structuring investigation that was incomplete as of this date.

After hearing the government's arguments on the motion, the trial judge informed defense counsel that:

**2.** In its brief, the government explains that it originally contemplated charging Gibson and Marin in the same indictment.

**3.** The government has a duty to act in good faith when moving to exclude time under the Speedy

"Well, from time to time, I get from the government motions to exclude time on ex parte motions. The reasons given to me are matters relating to the grand jury which can't be shared with the defendant, but I feel uncomfortable about doing it ex parte. I think the defendant is at least entitled to know that the motion has been made; that the reasons relate to grand jury matters which are confidential, and that those reasons become part of the record under seal."

The court thereafter issued a written order granting the government's motion on two grounds:

"1. [Marin] is alleged to have been involved in a cocaine conspiracy with another individual who is cooperating with the government in several pending investigations. In addition, the matters to be considered by the Grand Jury are complex. It is unreasonable to expect the filing of an indictment or information before August 28, 1991, in light of the fact that the investigations that Samuel Gibson is cooperating in will not be completed prior to June 29, 1991.

"2. The failure to grant such an extension would result in a miscarriage of justice. In addition, the facts upon which the grand jury must base its determination are unusual and complex."

■ On appeal from this ruling, Marin must show either legal error or an abuse of discretion. "Absent legal error, exclusions of time cannot be reversed except when there is an abuse of discretion by the court and a showing of actual prejudice." *United States v. Scott,* 784 F.2d 787, 789 (7th Cir.1986), *cert. denied,* 476 U.S. 1145, 106 S.Ct. 2257, 90 L.Ed.2d 702 (1986).

■ Marin argues that "the government's extension in this case was not made in good faith" and that its "*ex parte* submission [for an extension] was not made in good faith."[3]

Trial Act. *See United States v. Owokoniran,* 840 F.2d 373, 375 (7th Cir.1987); *United States v. Walton,* 814 F.2d 376, 379 (7th Cir.1987).

The defendant observes that the extension was granted over his objection and alleges that lack of diligent preparation was the real reason the prosecution needed additional time. Thus he argues the charges against him should have been dropped pursuant to 18 U.S.C. § 3162(a)(1) (charges "shall be dismissed or otherwise dropped" if the defendant is not indicted within the Speedy Trial Act's time limits), and Federal Rule of Criminal Procedure 48(b) (authorizing the dismissal of an indictment for any "unnecessary delay" by the government in presenting the charges to a grand jury).

▪ In support of his allegation of prosecutorial bad faith, the defendant points out that after the sixty-day extension had run the government returned only a single-count indictment for the exact same conduct for which Marin had been arrested. The government responds that this is not evidence of bad faith, but simply a reflection of the fact that it was unable to finish the investigation within the sixty-day extension period. Rather than seek an added extension of time, the government explains, it elected to issue the one-count indictment and add the conspiracy charge later in a superseding indictment. Thus, although the fruits of the government's investigations during the sixty-day extension were not reflected in its initial one-count indictment, they were reflected in the superseding three-count indictment that contained the conspiracy charge developed through the cooperation of Sam Gibson. It is important to point out, however, that even if the investigation had failed to produce enough evidence to support additional charges, this by itself would not support an accusation of prosecutorial bad faith. Obviously, not all investigations will accomplish what had been anticipated. Thus we have held that "[t]he question of the propriety of an ends of justice continuance is directed to the district court's exercise of discretion at the *outset* of a proceeding." *United States v. Vega*, 860 F.2d 779, 787 (7th Cir.1988) (citing *United States v. Janik*, 723 F.2d 537, 545 (7th Cir.1983)) (emphasis added). The government cannot make a determination to charge or not to charge until its investigation is completed—such decisions should not be made in a vacuum.

Marin also complains that although the government's motion stated that it was considering financial structuring charges against Gibson, no such charges were ever issued. The government answers that circumstances of this nature fail to provide evidence of bad faith. When it requested an extension of time, the government argues, it was contemplating issuing financial structuring charges against Gibson as he had an unusually large amount of assets for someone in his income bracket, including fur coats, expensive cars, and a $100,000 certificate of deposit. After the court granted the extension of time the government subsequently reached a plea agreement with Gibson, and thus a conviction, and at that time decided not to pursue the structuring charges. Thus the government in fact was contemplating charging Gibson with illegal financial structuring during the relevant sixty-day extension period and would have charged him had he not entered into a plea negotiation.

▪ Lastly, the defendant contends that the trial judge improperly based his decision to grant the government an extension on *ex parte* submissions from the government. Even though this argument is meritless on its face, we will address it. He points to this colloquy between the court and defense counsel during the hearing on the government's application as evidence that *ex parte* materials were improperly considered:

THE COURT: "Well, I do think, I think we have to keep two things separate. One is: Has the government made a good cause showing that they can't do it immediately? I'm satisfied that they have."

MR. JONES: "Now, Judge, are you saying you received something ex parte, obviously, that we haven't seen?"

THE COURT: "Obviously. That's why we are all here, and it will be part of the record, *but it relates to grand jury matters which I have reviewed in camera*, and I am satisfied that it provides the necessary good cause, although I certainly expect that there isn't going to be any extension on this" (emphasis added).

The government adamantly denies providing *ex parte* materials to the trial court. Although acknowledging that its motion to exclude time under the Speedy Trial Act was titled an "*ex parte* application," the government points to the record evidence that in fact it served this very motion on defense counsel and in fact defense counsel agrees that they received it. The only "*ex parte*" materials the trial judge mentioned seeing in the colloquy quoted above were the grand jury items that he stated he reviewed *in camera*. Thus it is reasonable to believe that the judge was referring to material from the grand jury that he was presiding over at the time.

Having reviewed these grand jury materials, we hold that the trial judge did not abuse his discretion in maintaining the secrecy of these grand jury items pursuant to Federal Rule of Criminal Procedure 6(e)(2) and the "long-established policy that maintains the secrecy of grand jury proceedings in the federal courts." *United States v. Proctor & Gamble,* 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958).

[6] There is no question that several developments, including Gibson's agreement to testify against Marin, forced some changes in the government's prosecutorial strategy. But "[t]here is nothing in the Speedy Trial Act which says that a continuance valid when granted becomes invalid *ab initio* if ... [c]ontingencies not foreseen when the continuance was asked for and granted ... arise that prevent the government from using the continuance for the purposes for which it was granted." *United States v. Carlone,* 666 F.2d 1112, 1115 (7th Cir.1981). We hold that the government's actions were proper and furthermore that it has refuted the defendant's speculative allegations of prosecutorial bad faith.

On review we are convinced beyond a doubt that the trial judge did not abuse his discretion in granting the government a sixty-day extension under the Speedy Trial Act. There being no legal error or abuse of discretion, we need not reach the issue of whether Marin has shown actual prejudice or whether he should be permitted to do so for the first time in his reply brief. *See Scott,*

784 F.2d at 789 ("Absent legal error, exclusions of time cannot be reversed except when there is an abuse of discretion by the court and a showing of actual prejudice").

## IV. *Batson*

Marin next argues that the government violated his right to Equal Protection by peremptorily striking a Hispanic venireman on the basis of his race.

The U.S. Supreme Court has outlined a three-step process to be used when evaluating Equal Protection claims concerning the government's allegedly discriminatory use of peremptory strikes:

> "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite [prima facie showing of a racially based peremptory challenge] has been made, the burden shifts to the prosecutor to articulate a race-neutral reason for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."

*Hernandez v. New York,* —— U.S. ——, ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citing *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–1724, 90 L.Ed.2d 69 (1986)).

It appears from the record in this case that after the voir dire of the first panel of jurors was concluded and both sides had completed their peremptory challenges, defense counsel requested that the government be directed to provide a race-neutral explanation for its decision to strike Armando Alvarez, a venireman of Hispanic descent. In response to this objection, the U.S. attorney made the following offer of proof:

> "Judge, the government's response is that, in taking notes on all of the twelve people and the people who were struck for cause, Mr. Alvarez had an eighth-grade education which was a much different education than my notes indicate for any of the other people on the panel. In addition, the government did not strike another individual

who had a high school education who also has a name of Hispanic origin."

The trial judge accepted this explanation as race neutral, and we will not overturn his finding unless it is clearly erroneous. *United States v. Nichols*, 937 F.2d 1257, 1262 (7th Cir.1991). As we explained in *United States v. Williams*, 934 F.2d 847 (7th Cir.1991), there are sound reasons for giving great deference to the findings of the trial court on this issue:

> "Whether an improper factor motivated a lawyer's use of a peremptory challenge is a determination which must be made by the district judge—often after an assessment of the lawyer's credibility. A trial judge develops an intuitive sense for evaluating the actions played out in the courtroom. An evaluation—such as determining credibility—is often difficult to make from reviewing a written transcript (or even viewing a video replay). It is the trial judge's sensory perceptions of what occurs during the course of a case, combined with an understanding of the bar and the public gained from experience in the community served by the court, which provides the trial judge with a unique insight."

*Id.* at 849.

■■ In reviewing whether a trial court committed clear error in finding the prosecutor's explanation to be race-neutral, we are also mindful of the Supreme Court's admonition that "the prosecution's explanation need not rise to the level justifying exercise of a challenge for cause," *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, and that, in fact, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, — U.S. at ——, 111 S.Ct. at 1866. Here the prosecutor made clear that he had no interest in the race of prospective jurors but that he did have an interest in selecting educated jurors to try this complicated drug conspiracy case. The record supports his claim in two respects: first, no juror who was selected had failed to graduate from high school, and second, the prosecutor had previously not objected to the seating of a Hispanic juror with a high school education.[4]

■ We refuse to accept the defendant's contention that discrimination was "inherent" in the prosecutor's education-based explanation or that this explanation was an "obvious mask for a race-based challenge."[5] The attainment of a certain educational level has been accepted by numerous circuits as a race-neutral criterion for exercising a peremptory challenge under the *Batson* mandate, and, as far as we can determine, has been rejected by none. In *United States v. Lane*, 866 F.2d 103, 106 (4th Cir.1989), for example, educational level was accepted as a race-neutral reason for striking a minority member where, as here, the prosecutor did not object to the seating of other minority members. *See also United States v. Mixon*, 977 F.2d 921, 923 (5th Cir.1992) (no *Batson* violation where a black was seated on the

---

**4.** The defendant correctly notes that accepting one minority member does not *ipso facto* entitle the prosecution to improperly strike another member of the same minority group. *See United States v. Ferguson*, 935 F.2d 862, 865 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992). But this does not mean that in determining whether a particular strike was racially motivated the court may *ignore* the fact that the government had not objected to the seating of another juror of the defendant's race who, in contrast to the stricken juror, satisfied the prosecutor's racially neutral criteria. *See United States v. Hughes*, 970 F.2d 227, 232 (7th Cir.1992) (fact that two of four blacks on the venire were empaneled weakens argument that government's strikes were based on a motive to discriminate); *United States v. Nichols*, 937 F.2d 1257, 1264 (7th Cir.1991) (relevant that black jurors were seated while the government still had peremptory challenges available); *United States*

*v. Esparsen*, 930 F.2d 1461, 1468 (10th Cir.1991) (although mere presence of members of a certain race on the final jury does not automatically negate a *Batson* violation, it can be a relevant factor, particularly when the prosecution had the opportunity to strike them).

**5.** We fully endorse a defense attorney's right, and even his duty, to be a zealous advocate. But we do not think this aphorism justifies the making of *unfounded* accusations regarding the motives of the federal prosecutor. Here we are disappointed that, despite the absence of any supporting evidence whatsoever, the defense, having already accused the U.S. attorney's office of not acting in "good faith" in seeking an extension in which to file its indictment, now charges the prosecutor with having exercised its peremptory strikes for racially discriminatory reasons.

jury while others were struck, some for low levels of education and non-supervisory positions at work).

Indeed, a juror's lack of education has been deemed a proper race-neutral explanation for peremptory strikes even in cases where *all* members of the minority group appear to have been struck. *See, e.g., United States v. Harrell,* 847 F.2d 138, 139 (4th Cir.1988), *cert. denied,* 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988); *United States v. Ross,* 872 F.2d 249, 250 (8th Cir. 1989); *United States v. Tucker,* 773 F.2d 136, 142 (7th Cir.1985), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986). Even the *Batson* Court itself referred in a footnote to the fact that a juror's educational level is a proper race-neutral factor in the exercise of peremptory strikes. The Supreme Court observed that "Prior to *voir dire* examination, which serves as the basis for exercise of challenges, lawyers wish to know as much as possible about prospective jurors, including their age, *education,* employment, and economic status, *so that they can ensure selection of jurors who at least have an open mind* about the case." *Batson,* 476 U.S. at 89 n. 12, 106 S.Ct. at 1719 n. 12 (emphasis added).

On this record, we are convinced that the trial judge did not abuse his discretion in finding that the government had exercised its peremptory challenges in a race-neutral manner.

## V. Sufficiency of the Evidence

After noting that his conviction must have been based principally on the testimony of Gibson, Marin argues that Gibson's testimony was "inherently unreliable" and "unworthy of belief." The defendant thus contends that the evidence was insufficient to sustain his conviction for conspiracy to distribute cocaine and for possession with intent to distribute cocaine.

A defendant urging that his conviction be overturned because it was not supported by sufficient evidence "carries a heavy burden." *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993) (citing *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.1992)). It is well settled that "[w]e review the evidence in the light most favorable to the government, and if we determine that a rational jury could have found the defendant guilty, we will affirm the conviction." *Id.* (citing *Burrell,* 963 F.2d at 987).

### A. Sufficiency of Evidence on the Conspiracy Charge

■ At the outset, we note that:

"A conspiracy is a confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act. To prove that a defendant was a member of the conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant. To establish that participatory link, the Government must offer sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose. When reviewing conspiracy convictions, we must be certain that the Government presented substantial evidence that the defendant was a conspirator. The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt."

*Campbell,* 985 F.2d at 344–45 (citations omitted).

Gibson, Marin's co-conspirator, testified in great detail not only to the existence of the conspiracy but also to the defendant's active participation in the conspiracy. According to Gibson's trial testimony, the conspiracy commenced in May 1990 when Marin offered to supply him with cocaine that he could resell and further asked for a job with Gibson's company in order that he might establish a cover for illicit drug activities. Gibson stated that in late July 1990 Marin provided him with an eighth of a kilogram of cocaine that he later resold to an undercover law enforcement officer, Mark Henry. Gibson also testified that during the summer of 1990 the defendant went to Florida to secure more cocaine, and that he and Marin had numerous phone conversations during that time period regarding their conspiracy to sell this cocaine in the Chicago area. He testified

that Marin returned from Florida in November with four kilograms of cocaine, and that he and the defendant proceeded to sell the four kilos. Gibson went on to testify that Marin supplied him with the half kilogram of cocaine he sold to Officer Henry on January 16, and also with a quarter kilo of cocaine on two other occasions.

In addition, the record discloses that the jury was presented with a substantial amount of evidence corroborating Gibson's testimony. Robert Warren testified that on two separate occasions he saw that Gibson had cocaine in his possession shortly after meeting with Marin. Warren and Anna Lewis, a former secretary at A–1, confirmed Gibson's statement that although Marin was ostensibly employed by A–1, in reality he never did any work for the company. Telephone records were introduced that corroborated Gibson's testimony concerning numerous phone calls that he alleges he made to Marin while Marin was in Florida. And when Marin's car was seized, agents found the secret compartment that Gibson had described and said they used to conceal their cocaine.

FBI surveillance confirmed that before the January 16 sale, Marin and Gibson met at a gas station and thereafter in a Jewel parking lot. Gibson drove to the site of the drug deal in Marin's car while Marin remained behind in Gibson's car far removed from the scene of the drug sale. Henry also wore a hidden recording device that taped Gibson telling him and Warren just prior to the sale that there was going to be a delay because he (Gibson) was waiting on "George," a name Warren testified Jorge was known by. Lastly, Warren corroborated Gibson's testimony regarding their post-deal conversation in which Gibson explained to Warren that the reason Marin had refused to show up in person at the drug sale was that he (Marin) was suspicious of Warren being a police officer.

Marin contends, however, that the testimony of the government's principal witness was "unworthy of belief and inherently unreliable." He points out that Gibson, an admitted drug-dealing felon who only struck a deal with the government after being arrested, is also an admitted perjurer who, among other things, has filed fraudulent tax returns and a fraudulent petition for bankruptcy. The defendant also views some aspects of Gibson's testimony as contradicting that of other witnesses.

It was the defendant's obligation to convince the jury that Gibson lacked credibility, and this he obviously failed to accomplish. Because questions of credibility are solely for the trier of fact, such arguments are "wasted on an appellate court." *United States v. Ruiz*, 932 F.2d 1174, 1178 (7th Cir.1991) (quoting *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989)). It is the trier of fact who "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *United States v. Duarte*, 1 F.3d 644, 651 (7th Cir.1993). *See also United States v. Seavoy*, 995 F.2d 1414, 1421 (7th Cir.1993); *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir.1993); *Churchill v. Waters*, 977 F.2d 1114, 1124 (7th Cir.1992).

Marin thoroughly but unsuccessfully attacked Gibson's credibility at trial, and the jury, "which is the only entity entitled to make such credibility determinations, apparently decided to believe" Gibson's testimony despite his "many character flaws." *Ruiz*, 932 F.2d at 1178 (quoting *Molinaro*, 877 F.2d at 1347).

We hold that the evidence when viewed in the light most favorable to the government was sufficient to establish Marin's participation in the charged conspiracy.

B. Sufficiency of Evidence on the Possession with Intent to Distribute Charge

Marin also challenges the sufficiency of the evidence to support his conviction for possession with intent to distribute cocaine on January 16, 1991. The two elements of this crime are (1) the knowing possession of cocaine, and (2) an intent to distribute it. *See United States v. Moralez*, 964 F.2d 677,

679 (7th Cir.1992). We may not overturn a defendant's conviction for this offense unless "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt...." *Id.* (quoting *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)).

 A review of the record establishes that Gibson testified that he called Marin prior to the January 16, 1991, deal and that Marin agreed to meet him to supply the half kilogram Gibson needed. On the day of the sale, however, Marin was late for their planned meeting, so Gibson went to the site of the sale and advised Warren and Henry that he was waiting on "George" (the name Marin was known by).

Gibson further testified that Marin then paged him and set up a meeting at a nearby gas station. At the meeting, Marin told Gibson that he suspected Warren was a law enforcement officer and that he thus refused to attend the drug sale in person. The two drove to a Jewel parking lot, where Marin pointed out where the cocaine was hidden in the secret compartment in the armrest of his car, and exited the car. Gibson then drove Marin's car containing the cocaine to the site of the drug transaction while Marin remained in Gibson's car at the Jewel lot. After the deal, Gibson drove Marin's vehicle back to the Jewel parking lot and he and Marin divided the profits from the sale and departed in their own cars. An hour later, Marin paged Gibson to make sure he was "OK." Finally, a week after the January 16 deal, Gibson met Warren at a restaurant and, because Warren appeared upset and nervous about Marin's failure to show up at the sale, Gibson recounted to Warren Marin's suspicions and explained the precautions they had taken, including switching cars at the Jewel lot.

Again we note the FBI surveillance that corroborated Gibson's testimony concerning his meeting with Marin, before the sale to switch cars, and after the sale to split the profits and again exchange cars.

 The government need not establish a defendant's physical presence at a drug sale in order to implicate him in the transaction. *United States v. Luschen,* 614 F.2d 1164, 1174 (8th Cir.1980), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980). We hold that, when viewed in the light most favorable to the government, Gibson's testimony, together with the corroborating evidence provided by the government's other witnesses, would permit a reasonable jury to find that, on January 16, 1991, Marin possessed cocaine with the intent to distribute it.

## VI. Hearsay

Finally, Marin argues that the district court committed reversible error when it admitted Gibson's testimony concerning a conversation he had with Warren more than a week after the January 16, 1991, cocaine sale. Gibson's testimony regarding this post-deal conversation contained, in pertinent part, the following statements:

Q: What was the purpose of meeting with Mr. Warren?

A: To sit and talk with him and, you know, calm him down and, you know, explain to him what had happened in the deal.

Q: Why did you have to calm him down?

A: He was a little upset, nervous. He wanted to know what had happened, you know, what happened to Jorge and all that, and I explained to him what happened....

Gibson went on to testify that:

"I told [Warren] that [Marin] thought you was the police and he didn't trust you.... The specific statement was, after the deal, did everything go okay after the deal. And I told him that everything went OK after the deal.... I told him Jorge was supposed to meet me at Zante's Restaurant and that he was not there when I got there. So I drove down looking for him, he was not there. I told him that Jorge was across the street—when he did show up, he was across the street at the Phillips 66 gas station.... I told him, after I left you, after telling you that I was waiting on Jorge, that I received a page when I was

heading back down to 103rd, and it was Jorge, and I went down and I met Jorge.... Jorge followed me to the Jewel's and we had exchanged cars there, and I got in Jorge's car and I drove over to the Schoops Restaurant."

According to the defendant, the above testimony was inadmissible hearsay. The question first arose on February 4, 1992, when the government filed an evidentiary proffer in which it asked the court to admit the conversation pursuant to Federal Rule of Evidence 801(d)(2)(E), which provides that a statement is not hearsay if it is made by a co-conspirator of a party "during the course and in furtherance of the conspiracy." The judge deferred ruling on the issue, but it arose again during a sidebar conference during Gibson's direct examination when the assistant U.S. attorney advised the judge that at this time he "would like to get into the meeting a week after the January 16."

The judge ruled that "[Gibson has] already testified to all these subsequent conversations in March and so forth and I find, therefore, that the conspiracy, at least from the government's witnesses, was still in progress, and that if their proffer is correct that this conversation with the customer was to alleviate the customer's concerns over the actions of the defendant, that therefore the conversations would be in furtherance of the conspiracy and you may go into it with him."

While "[m]ere idle chatter, narrative declarations and superfluous casual remarks are not statements in furtherance of a conspiracy," *United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir.1991), statements designed to reassure a co-conspirator of the wisdom of continuing to participate in the criminal enterprise are in furtherance of a conspiracy. *See Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir.1989) (citing *United States v. Mason*, 658 F.2d 1263, 1270 (9th Cir.1981)). The defendant argues that the disputed testimony in this case was no more than a recounting of a casual conversation that did nothing to advance the conspiracy. The government, on the other hand, contends that Gibson's explanation of why Marin was absent from the scene of the January 16 drug sale was intended to reassure Warren that Marin's sus-

picious behavior was not an indication that the conspiracy was in trouble.

■ We review a trial court's determination that statements serve to further a conspiracy for clear error. *United States v. Molinaro*, 877 F.2d 1341, 1345 (7th Cir.1989) (citing *United States v. Shoffner*, 826 F.2d 619, 627 (7th Cir.1987), *cert. denied, Stange v. United States*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987)). If a reasonable basis exists for concluding that the statements furthered the conspiracy, the trial court's ruling will not be disturbed. *Id.*

■ That a reasonable basis exists for the trial court's determination that Gibson's statements to Warren were in furtherance of the conspiracy is apparent from the very content of the challenged testimony. Gibson testified that the purpose of his having this conversation with Warren on January 25, 1991, was to "calm him down and ... explain to him what had happened in the [January 16, 1991] deal" because Warren was "upset, nervous" and wanted to know "what happened to Jorge."

■ A court may conclude that statements are in furtherance of a conspiracy even though the statements are susceptible of alternative interpretations. *Garlington*, 879 F.2d at 284 (quoting *United States v. Mackey*, 571 F.2d 376, 383 (7th Cir.1978)). We hold, therefore, that the trial court did not commit clear error in concluding that the Gibson–Warren conversation was intended to reassure Warren about the conspiracy and thus was "in furtherance" of the conspiracy within the meaning of Federal Rule of Evidence 801(d)(2)(E).

## VII. Conclusion

For the foregoing reasons, the conviction of Jorge Enrique Marin is AFFIRMED.