In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2004

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GARY R. ROTH,

Defendant-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98-CR-116-C-01--Barbara B. Crabb, Judge.


Argued November 9, 1999--Decided January 7, 2000


Before Bauer, Easterbrook and Kanne, Circuit Judges.

Bauer, Circuit Judge. On December 9, 1998, a grand jury in the Western District of Wisconsin returned a three count indictment against appellant Gary R. Roth ("Roth"), charging him with conspiracy to manufacture and distribute marijuana, possession with intent to manufacture marijuana, and criminal forfeiture, in violation of 21 U.S.C. sec.846 and 21 U.S.C. sec.841(a)(1). Pursuant to a plea agreement in which he preserved his right to appeal the denial of his Motion to Suppress, Roth pled guilty to conspiring to manufacture and distribute marijuana, structuring currency transactions, and criminal forfeiture and was sentenced to a ten year prison term on the conspiracy charge and a concurrent five year prison term on the structuring charge. He was also sentenced to a term of supervised release. Because he was found to be the leader in the offense, his sentence was enhanced two levels under U.S.S.G. sec.3B1.1. Roth appeals, claiming that the search warrant was not supported by probable cause. He also appeals the two level enhancement and the District Court's finding that he was the leader of the marijuana growing operation. We affirm.

I. BACKGROUND

Gary Roth and his wife, Dawn, owned a farm in rural Vernon County, Wisconsin. On the farm they

raised hogs and grew a cash crop. In September, 1998, the authorities learned that the Roths were also growing marijuana in their pig barn.

According to informant Robert Rhoda ("Rhoda"), he and Gary Roth began growing marijuana in the pig barn in 1993. Using 200 plants they obtained in Amsterdam, Rhoda and Roth became equal partners in the marijuana operation. The two made substantial amounts of money from the operation and within three years were up to 6,000 plants. In September, 1996, however, they had a falling out over profits and dissolved the partnership. Roth then took over the entire operation.

In September, 1998, after he had sneaked back onto the farm to verify that the marijuana growing operation was still functioning, Rhoda went to the Wisconsin Department of Justice, Division of Narcotics Enforcement ("DNE") and informed on Gary and Dawn Roth. In exchange for use immunity, Rhoda described the entire operation. His statements became the cornerstone of the warrant affidavit which Roth now challenges.

Rhoda described for the agents how the pig barn was actually three buildings arranged in the shape of a "T," with the middle barn being used as the grow site, and explained the layout of the middle barn, which included two flowering rooms, a vegetation room and a cloning room, each containing 1800 to 2000 plants. He detailed the type and amount of equipment contained in each room, down to the regulated room temperature, the timing of the grow lights, the color of the walls and the brand name of the mulch used.

Rhoda further provided information as to the places on the farm where he believed Gary Roth hid his money and how he and Roth deposited money in structured deposits in banks in DeSoto, Genoa, LaCrosse, Chicago and St. Paul. As to Dawn Roth, Rhoda reported that she had known about the marijuana operation before the dissolution of his partnership with Gary and that she had participated in the negotiation of his severance payment.

To corroborate Rhoda's statements, the DNE agents verified the existence of the Roth farm. Then, on October 27, 1998, Rhoda contacted the DNE agents again, saying that Dawn Roth had called and asked him to take care of the farm for five days in December while she and Gary were gone for the holidays. Rhoda said he understood Dawn Roth's request to mean that she wanted him to take care of the marijuana plants as well as the hogs. In return for his services he reported that he had been offered $100 a day.

On November 24, 1998, agents monitored a telephone call Rhoda made to Dawn Roth to discuss the arrangements for taking care of the "hog operation."/1 Rhoda asked Dawn to mail him the instructions, but Mrs. Roth declined, saying that was not a good idea and questioning what would happen if the mail got lost. She invited Rhoda out to the farm instead. The meeting was scheduled for four days later.

The day after the telephone conversation, DNE agents sneaked onto the farm to conduct surveillance and take a thermal imaging scan of the middle barn. While doing so, the agents claimed they were able to smell marijuana when they were 100 feet from the barn. One must assume either very clean pigs or very strong marijuana.

During this four day period between the telephone call and Rhoda's meeting with Dawn Roth the agents also obtained records of the farm's electrical usage. Around the time Rhoda and Roth were beginning to grow the marijuana, the records showed a spike in usage. Indeed, in December, 1992, the power company had to install a 37.5 KVA transformer at the Roth's farm to handle the increased electrical consumption./2 The general manager of the power company, when interviewed by the DNE agents, was unable to explain why such a large transformer was needed for the Roth's farm. He indicated that normally a 15 to 25 KVA transformer was sufficient for a farm like the Roth's. In reviewing the Roth's electrical usage, the general manager also said that the level of use was consistent with a large dairy milking operation. While on the Roth's property, however, the agents saw no evidence of a dairy milking operation.

On November 28, 1998 Rhoda met with Dawn Roth at the farm. Rhoda wore a body wire and taped the conversation. He asked Mrs. Roth what he would have to do to take care of the "hog operation." She said all he needed to do was "water them and remove the hoods." According to Rhoda, this meant he had to water the plants and move the grow lights around them.

A search warrant was issued by the Magistrate Judge on December 2, 1998 and executed by the DNA agents the following day. At the farm the agents found an indoor marijuana growing operation with 4242 active plants in the middle pig barn. After the plants were discovered, Gary and Dawn Roth admitted to their involvement in the operation./3

Following Gary Roth's plea on February 19, 1999, the probation office prepared a presentence report ("PSR"). In the PSR, the probation office

recommended a two-level increase to Roth's base offense level for his role as a leader pursuant to U.S.S.G. sec.3B1.1. The probation office noted that Roth employed his wife to work for him in the business and he determined what share of the proceeds she would receive.

At Roth's sentencing, the District Court enhanced Roth's base level offense two points for his role in the offense under U.S.S.G. sec.3B1.1. The court found that Roth was a leader in the offense because he directed his wife in her duties, paid her a cash wage and he received a much larger share of the proceeds. Roth was sentenced to a ten year prison term on the conspiracy charge and a concurrent five year prison term on the structuring charge. Had his base level not been enhanced, his sentence would have been approximately half of what he received.

II. DISCUSSION

A. Standard of Review

Prior to entering his plea of guilty, Gary Roth filed a variety of motions, including a motion for a Franks hearing and a motion attacking the warrant affidavit for lack of probable cause. The Magistrate Judge recommended that both motions be denied. The District Court undertook a de novo consideration of the motions and adopted the Magistrate's recommendations. We review the District Court's denial of Roth's request for a Franks hearing for clear error. United States v. Amerson, 1999 WL 424314 at *11 (7th Cir. June 23, 1999). The probable cause determination is reviewed de novo. United States v. McKinney, 143 F.3d 325, 328 (7th Cir. 1998). As for the District Court's factual determination that Roth qualified for an aggravating role adjustment under sec.3B1.1, we review that for clear error. United States v. Wilson, 134 F.3d 855, 869 (7th Cir. 1998).

B. Roth's Request For A Franks Hearing

Roth first contends that under the holding of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), he was entitled to a full evidentiary hearing on his motion to quash and suppress evidence. In Franks, the Supreme Court held that the Fourth Amendment requires an evidentiary hearing into the truthfulness of an allegation contained in an affidavit supporting an application for a search warrant "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant

affidavit, and if the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56, 98 S.Ct. at 2676.

Franks makes clear that it is the state of the mind of the affiant that is at issue. Here, Roth challenges the veracity of certain statements made by Rhoda. But the affiant was DNE Special Agent Dave Matthews, not Robert Rhoda. The question of whether Rhoda made untrue statements is not relevant unless Roth can show that Agent Matthews included them in his supporting affidavit despite his knowledge that they were false or with reckless disregard for the truth. United States v. Pritchard, 745 F.2d 1112, 1119 (7th Cir. 1984) (citation omitted). This Roth cannot do and he makes no attempt to do so. Moreover, we note in passing that Rhoda was present during the presentment to the Magistrate and was obviously available to answer any judicial inquiry.

Instead, he merely argues that "[f]alse statements can be stricken when one government agent deliberately or recklessly misrepresents information to a second agent, who in turn, then includes the representation in an affidavit," citing United States v. McAllister, 18 F.3d 1412 (7th Cir. 1994). Roth, however, offers no supporting authority for his belief that Rhoda became a governmental agent once he gave his statements to the DNE and we decline to make such a finding.

We believe that Roth's challenge to the District Court's denial of his request for a Franks hearing is misdirected. Whether or not Rhoda provided false information is not the issue in deciding whether Roth is entitled to such a hearing. The issue is whether Agent Matthews knowingly gave false information in his sworn affidavit or swore to information with a reckless disregard for its truth. We do not believe the District Court erred in deciding that Agent Matthews did not do so and thus we affirm the District Court's denial of the request for a Franks hearing.


C. Whether The Search Warrant Affidavit Established Probable Cause

Roth next argues that the affidavit in support of the search warrant did not provide probable cause to support the warrant. Roth argues that Rhoda's statements are insufficient by themselves and that there is insufficient independent evidence to corroborate Rhoda's statements.

A search warrant affidavit establishes probable

cause when it "sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." United States v. McNeese, 901 F.2d 585, 592 (7th Cir. 1990), citing Berger v. New York, 388 U.S. 41, 55, 87 S. Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967). See also Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996). The Supreme Court has refused to define probable cause, saying that whether it has been established varies with the facts of each case. Ornelas, 517 U.S. at 696. We have set forth the facts of this case with considerable detail. The fact that Roth can point out additional things which could have been done but were not does not in any way detract from what was done. Rhoda gave remarkably detailed statements about the operation to the agents which the agents corroborated through surveillance and other means. The agents also obtained and reviewed power records, and interviewed the general manager of the power company to determine whether the Roth's power usage was consistent with the operation of a farm or the operation of a marijuana growing operation. Finally, they listened to conversations between Rhoda and Dawn Roth which, in context, seem to confirm that the Roths were growing marijuana in their pig barn.

The evidence needed to obtain a search warrant is not the same as the evidence needed to convict. It is less. "Probable cause requires only a probability or a substantial chance of criminal activity not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243-44 n.13, 103 S.Ct. 2317, 2335, 76 L.Ed.2d 527 (1983). The evidence in this case clearly establishes probable cause. The decision of the District Court is therefore affirmed.

D.   The Enhancement Of Roth's Sentence

Roth lastly charges that the District Court erred by enhancing his base offense level two points under U.S.S.G. sec.3B1.1 for his role as the leader of his wife in the conspiracy. He claims that his wife was his equal partner. The evidence, however, does not bear this out.

Section 3B1.1 of the Sentencing Guidelines provides for a two-level enhancement of a defendant's base offense level if "the defendant was an organizer, leader, manager or supervisor in any criminal activity." U.S.S.G. sec.3B1.1. Application Note 4 to Section 3B1.1 provides some factors for use in evaluating whether the defendant was a leader, manager or supervisor. Those factors include:

(1) level of decision-making authority;

(2) nature of participation;

(3) recruitment of accomplice;

(4) right to a larger share of the profits;

(5) degree of participation in planning and organizing;

(6) nature and scope of the criminal venture; and

(7) degree of control over others.

U.S.S.G. sec.3B1.1, Application Note 4.

Noting that Dawn Roth was not a partner in the operation when it began in 1993, that she did not even see the plants until 1994, that she did not start taking care of the plants until January, 1998 and that her duties consisted mainly of watering the plants for a cash wage, while her husband was responsible for the cloning, sales and distribution, the District Court found that Dawn Roth was not a partner and was directed by her husband.

This finding is buttressed by the great disparity in the amount of money each received from the business. Approximately seven pounds of marijuana were sold every other week, at a price of $2,800 per pound. Dawn Roth received only $400 per pound sold, or $2,800 bi-weekly. Gary Roth retained the rest, approximately $16,800. Thus, he kept 85% of the proceeds for himself. Hardly an equal partnership as Roth contends. By arguing that Dawn shared equally in the luxury items he bought with the money, Roth attempts to obfuscate these facts.

Given the evidence, the District Court's finding that Gary Roth exercised a position of leadership over his wife in the conspiracy is not clear error. The two-level enhancement under U.S.S.G. sec.3B1.1 was proper.

III.  CONCLUSION

Gary Roth made a poor choice in selecting his business partner. Because of Rhoda, his profitable business has been shut down and he is now in prison. None of the arguments Roth presents on appeal changes these results though. For the foregoing reasons, the judgment of the District Court is affirmed.
AFFIRMED.

/1 According to Rhoda, "hog operation" was the code name they always used when talking about the marijuana growing operation over the telephone.

/2 We are aware that there is a slight discrepancy between the power company's records showing that a larger transformer was installed at the Roth's farm in December, 1992 and Rhoda's statement that he and Roth did not begin growing marijuana until 1993. We believe the most logical explanation is that Rhoda may have mistaken the date by a few months.

/3 Although Dawn Roth was also indicted for offenses relating to her involvement in the marijuana growing operation, she is not part of this appeal.