UNITED STATES of America,
Plaintiff,

v.

Andrew ACOSTA, Mohammed Ayesh, Doug Beyreis, Christopher Colton, Carlos Diaz, Shaun Dougherty, Jorge Espada, Vernon Fields, Felix Guzman, Jerry Guzman, Bernardo Hernandez, Raul Maldonado, Daniel Martinez, Pedro Martinez, Gamaliel Matos, Natanael Matos, Antonio Mendez, Alvaro Mendoza, Daniel Mendoza, Raciel Mendoza, Raymond Mendoza, Maico Navejar, Larry Olson, Thomas Overland, Raymond Rivera, Juan Roman, Michael Rosado, Mark Turner, Michael Turner, Alejandro Vallejo, Wilfredo Vasquez, Herminio Vega, Robert Weinstock, Defendants.

No. 98–CR–0104.

United States District Court,
E.D. Wisconsin.

Aug. 3, 2000.

Karine, Moreno–Taxman, Asst. U.S. Atty., David Robles, Sp. Asst. U.S. Atty., Milwaukee, WI, for Plaintiff.

Adam Essling, Milwaukee, WI, for Defendants.

### DECISION AND ORDER RE: DEFENDANT ROSADO'S MOTION TO SUPPRESS EVIDENCE RECOVERED DURING SEARCH OF 5643 NORTH 36TH STREET

ADELMAN, District Judge.

Defendant Rosado seeks an order suppressing evidence seized during a June 22, 1998 search of his residence on Fourth and Fourteenth Amendment grounds. Officers initially made a consensual "protective sweep" to look for persons on the premises. They then used information gleaned during this search to support an affidavit, pursuant to which a search warrant was issued. Rosado contends that the protective sweep was nonconsensual, and further contends that the affidavit supporting the search warrant did not establish probable cause.

Magistrate Judge Gorence held an evidentiary hearing on Rosado's motion to suppress on August 16, 1999, and issued a recommendation August 30, 1999. (Docket # 1027 [hereinafter "Recommendation"].) Rosado filed timely objections, and the government filed a response. I review the recommendation de novo. *See* 28 U.S.C. § 636(b)(1)(B).

**1.** That indictment has since been superceded.

## I. FACTUAL BACKGROUND

On June 19, 1998, a federal grand jury returned an indictment naming 33 defendants, allegedly members of the Latin Kings.[1] Count 1 of the indictment alleged a Latin Kings RICO enterprise. Count 3 alleged drug offenses, and was the only count with which Rosado was charged.

Arrest warrants were issued pursuant to the indictment, and on the morning of June 22, 1998 defendants Rosado and Natanael Matos were arrested outside Rosado's residence. After Rosado's arrest, Sergeant Manfred Harpole of the Milwaukee Police Department asked Rosado's live-in girlfriend (now wife) Marilyn Marrero, for "*full* consent to search her residence for people *or evidence of any crimes.*" (Tr. of 8/16/99 Evid. Hrg. at 16 [hereinafter "Tr."] ) (emphasis added). Marrero refused. Sergeant Harpole then requested permission to "limit my search and check just for the safety of our officers *for people* and any potentially other [sic] *Latin King members* who were named as in [sic] arrest warrants *or any other person* who may have been wanted." (Tr. at 17.) At the evidentiary hearing, Sergeant Harpole and Marrero gave conflicting testimony about whether Marrero voluntarily consented to such a search. Sergeant Harpole testified that no promises or threats were made, and no weapons were drawn, while Marrero contended that she allowed the protective search only after being threatened with arrest and incarceration if she refused.

Believing that he had consent, Sergeant Harpole and other officers entered the residence to conduct the "protective sweep." They allowed Marrero to follow them at a short distance. In the upper story, which was a partially converted attic, Sergeant Harpole and FBI Special Agent Zorka Marinovich observed a pile of clothing strewn about. Approximately 20 to 30 garments were black and gold in color; many of these garments were related to sports teams.[2] According to law enforce-

**2.** According to the inventory of items seized later in the day pursuant to the search war-

ment officials who investigated the Latin Kings, black and gold are the Latin Kings' "official colors."

In the basement Sergeant Harpole observed, in plain view on a shelf, a black plastic box measuring approximately 4 inches by 8 inches by 1.5 or 2 inches. (Tr. 22.) Because the box was of these dimensions and was made of black plastic, Sergeant Harpole believed that it "might be potentially a gun case." (Tr. at 20.) He believed this because his police-issue gun also came in a black plastic case about an inch longer and an inch wider, that is, 10 inches by 5 inches. (Tr. at 22.) Sergeant Harpole conceded that the plastic box was not large enough to hide a person. (Tr. at 35.) He picked up the box, which allowed him for the first time to see the word "Remington" on it. The box was heavy, which led him to think that it likely contained a gun. He then opened it. The box contained hundreds of .22 caliber bullets. Sergeant Harpole then returned the box to the shelf.

At 3 p.m., FBI Special Agent Christopher W. Koenig, Sr. submitted to a magistrate judge a nine-page affidavit in support of an application for a search warrant for the residence. The first half-page provided a general introduction and asserted—erroneously—that a copy of the grand jury's indictment was attached.[3] The affidavit did not assert that Rosado had been indicted.

The affidavit next spent half a page specifying various categories of crimes that "Latin King members" had allegedly committed, and asserted that the Latin Kings were an association-in-fact enterprise under the RICO statute, 18 U.S.C. § 1961(4). (Aff.¶¶ 2, 2(i).) These alleged crimes included murder and homicide, at-tempted murder and homicide, drug trafficking, firearm offenses, robbery, kidnapping, and others. (*Id.* ¶ 2.) The affidavit did not assert that Rosado had committed any of these categories of crime, that he had aided or abetted anyone else in doing so, or that his residence was in any way connected to them.

The affidavit then spent over two pages detailing the alleged organizational and management structure of the Latin Kings, providing such details as its having a written "manifesto"; protecting territory from rival gang members through violence and intimidation; marking its territory with graffiti; holding joint meetings called "Nation meetings"; having subchapters with specified leadership and membership levels such as Incas, Caciques, Enforcers, and "Junior Kings"; using violence; and punishing disobedient Latin Kings through beatings, robberies, or death. (*Id.* ¶¶ 2(a)—(h), (j)—(k).) The affidavit made no assertion that Rosado had any involvement or participation in any of these activities; that he had aided or abetted anyone else in them; or that his residence was in any way related to any of these activities.

The affidavit next spent one and a half pages detailing various means and methods that Latin King members had allegedly used "to accomplish some of the objects and purposes of the Latin King enterprise." (*Id.* ¶ 3.) The alleged means and methods used to advance the Latin King enterprise included murder of members of rival gangs; murder of suspected government informants; and arson against the person and properties of rival gangs and of potential witnesses against the Latin Kings. (*Id.* ¶¶ 3(a)—(b).) The affidavit did not assert that Rosado had engaged in any of these activities, that he had aided or

---

rant, these items included a black and gold Green Bay Packers baseball cap; a gold Milwaukee Brewers shirt; a gold pullover Packers jacket; a gold Packers hooded sweatshirt; a Pittsburgh Penguins sweatshirt; a black and gold Penguins hooded sweatshirt; and a Pittsburgh Penguins jersey.

3. The original, signed and sealed affidavit is in the court's file, and no indictment is attached to it; no copy of the indictment is loose in the file; and the docket does not reflect that a copy of the indictment was filed. *See* Case No. 98–M–50.

abetted anyone else in doing so, or that his residence was in any way related to any of these activities.

The affidavit then spent half a page asserting in the passive voice that:

It is believed that the following items, which are evidence of a RICO enterprise, narcotics trafficking, and other crimes, may be located within the residence:

a. The "Latin King Manifesto" ...;

b. Folders containing the Manifesto of the Latin King Nation—Book of Rules and Laws, and a list of Latin King and Junior Latin King gang members and their telephone numbers;

c. Lists of Latin King and Junior Latin King gang members and numbers consistent with the above document, including a dues list ...;

d. Law enforcement reports relative to criminal cases involving Latin King gang members identifying witnesses to the criminal cases;

e. Correspondence from Latin King gang members to other Latin King members related to testimony, pending cases, police reports related to various individuals, retaliation against witnesses and the location of evidence.

(*Id.* ¶ 4.) The affidavit did not state who believed that these items would be located within Rosado's residence, and it did not state why it was believed that these items would be located there.

The affidavit then spent one and a half pages, based on discussions with agents with extensive experience in narcotics investigations, summarizing specific behaviors common to drug and narcotics traffickers (such as having large amounts of unexplained cash and engaging in frequent interstate travel), and specific characteristics common to their residences (such as having paraphernalia for packaging, cutting, weighing and distributing cocaine). (*Id.* ¶ 5.) The affidavit did not assert that

Rosado had engaged in any of the behaviors common to drug and narcotics traffickers; that he had aided or abetted anyone else in such behaviors; or that his residence had any of the characteristics common to drug traffickers' homes.

The affidavit next asserted, over a third of a page, that "According to several cooperating informants, Latin King members often use firearms to further their violent criminal activity and it is common for them to store firearms within their residence." (*Id.* ¶ 6.) The affidavit said nothing about the informants' reliability; veracity; or basis of knowledge for these claims. It said nothing about whether the informants made first-hand observations, or about whether law enforcement officials independently verified any of their claims about firearms. The affidavit made no assertion that Rosado had used a firearm to further violent criminal activity, that he had aided or abetted anyone else in doing so, or that firearms were stored at his residence.

The affidavit next summarized in two-thirds of a page the consensual "protective sweep" search conducted at the residence earlier in the day and what was found:

Ms. Mannero [sic] subsequently authorized agents to search the residence for people. Officers then entered the residence, and during their search for people, they entered the basement and found within plain view a black plastic gun case. According to the searching officers, the gun case felt full as if an object were contained inside. The officers opened the gun case and found several hundred rounds of .22 caliber ammunition. Officers then entered the attic of the residence and located in plain view black and gold clothing, which according to the investigation, is the official colors of the Latin King gang, as well as sport team jackets, also black and gold in color.

(*Id.* ¶ 7.)

The affidavit then summarized, based upon law enforcement officers' surveillance

and observations, half a page of reasons for believing that Rosado lived at the residence. (*Id.* ¶ 8.)

The final half-page of the affidavit concluded that, based upon the above information, Special Agent Koenig had "probable cause to believe that the residence . . . contains evidence of a RICO enterprise and other crimes." (*Id.* ¶ 9.)

The magistrate judge issued the requested search warrant. Pursuant to the search warrant, officers conducted a second search of the residence around 7 p.m., and seized incriminating evidence including the black and gold clothing and the gun case with the bullets.

Judge Gorence recommended that I find that the initial protective sweep was consensual; that Sergeant Harpole's picking up and opening the black plastic case in the basement exceeded the scope of consent; but that the search warrant was nonetheless based upon probable cause. Rosado objects to the first and third recommendation.[4]

## II. CONSENT FOR "PROTECTIVE SWEEP"

Rosado first contends that the initial protective sweep was without consent or a warrant, and therefore violated the Fourth Amendment. Rosado objects that the totality of the evidence indicates Marrero's consent was not freely given for these reasons: She was told that she would be taken into custody if she did not consent; she observed Rosado, her live-in boyfriend and the father of her children, being arrested; at least two officers present at the scene were wearing "raid" gear; she was asked twice for permission to search the house for persons; she did not give written consent for a search; she was not informed that she had the right to refuse a search; she was nervous and had never been in a similar situation; and she had her two young children at home with her. The testimony conflicts on whether Marrero was threatened with being taken into custody unless she authorized a protective sweep.

Rosado raised all of these arguments, most of them verbatim, in his motion before Judge Gorence. (*Compare* Br. in Supp. of Michael A. Rosado's Mot'n to Suppress Evidence Recovered During Search of 5643 North 36th Street [docket # 1011] at 5–7 *with* Br. in Supp. of Objs. at 7–10.) Having independently reviewed the relevant portions of the transcript of the evidentiary hearing, I adopt Judge Gorence's legal analysis and recommended findings that Marrero was not threatened and did give voluntary consent for a limited protective search.

■ I also adopt Judge Gorence's finding that Sergeant Harpole exceeded the scope of Marrero's consent when he opened the black plastic box. The rule is straightforward:

> Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search.
>
> A consent search is reasonable only if kept within the bounds of the actual consent.

*United States v. Dichiarinte,* 445 F.2d 126, 129 (7th Cir.1971). Similarly, if officers obtain consent or a warrant to search for a stolen television set, "they must limit their activity to that which is necessary to

---

4. Rosado also objects to Judge Gorence's implicit finding that Sergeant Harpole believed, based upon his training and experience, that more members of the Latin Kings might be inside Rosado's residence because both Rosado and Natanael Matos were arrested immediately outside the residence. (Recommendation at 4.) As Rosado observes, though, the issue "does not appear to have had an effect on the Magistrate's recommendation." (Br. in Supp. of Objs. of Def. Rosado's Objs. to the Magistrate's August 30, 1999 Recommendation [docket # 1037] at 6 [hereinafter "Br. in Supp. of Objs."].) I agree that this issue is not material, and therefore do not address it.

search for such an item; they may not rummage through private documents and personal papers." *McGann v. Northeast Illinois Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1180 (7th Cir.1993).

■ In this case, Sergeant Harpole asked Marrero for, and was denied, *"full* consent to search her residence for people *or evidence of any crimes."* He then requested and received permission to search "for people and ... other Latin King members ... or any other person who may have been wanted." Thus, Sergeant Harpole had "actual consent," *Dichiarinte,* 445 F.2d at 129, to search for people and nothing else. He acknowledged that the plastic box could not hide a person. The warrantless search of the contents of the box thus may not be defended as consensual.

■ The government next seeks to defend this search under the "plain view" exception to the Fourth Amendment. *See Coolidge v. New Hampshire,* 403 U.S. 443, 456, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion). Under *Coolidge,* three requirements must be satisfied before police may seize private possessions in plain view without consent. The third of these requirements is that the incriminating nature of the object seized must be "immediately apparent." *Id.* at 466, 91 S.Ct. 2022. This is comparable to *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), where an officer suspected that expensive stereo components that looked out of place in a squalid apartment might have been stolen, and moved them so that he could read their serial numbers. The Supreme Court applied *Coolidge*'s requirement—that an item's incriminating nature must be "immediately apparent" before it can be seized—to mean that, absent a search warrant, an object in plain view may be moved, opened, or otherwise intruded upon only if there is probable cause. *See id.* at 326, 107 S.Ct. 1149. The government therefore contends that Sergeant Harpole had probable cause to lift and open the box, based upon his later

testimony that he thought the box "might he potentially a gun case."

Probable cause judgments are much better made by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). According to the Supreme Court, an officer with sufficient probable cause to obtain a search warrant is "foolish" not to get a search warrant, because he risks suppression of all evidence; the government must assume the "onerous burden of convincing a trial court that no information gained from the illegal [search] affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Murray v. United States,* 487 U.S. 533, 540, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

The facts of this case are not even close to cases in which the Seventh Circuit has found probable cause to believe that incriminating evidence found in plain view was present: shotgun shells found in a bank robbery case, *see United States v. Bruce,* 109 F.3d 323, 329 (7th Cir.1997); an empty ammunition box found in a search for drugs, *see United States v. Cooper,* 19 F.3d 1154, 1163 (7th Cir.1994); a large amount of money found in a defendant's car after a drug transaction, *see United States v. Cervantes,* 19 F.3d 1151, 1153 (7th Cir.1994); a gun silencer found while searching for drugs, *see United States v. Carmany,* 901 F.2d 76, 78 (7th Cir.1990); money and maps found in a bank robbery case, *see United States v. Walton,* 814 F.2d 376, 380 (7th Cir.1987).

In this case, the only thing "incriminating" about the box were its measurements, $4'' \times 8'' \times 1.5$–$2''$, and the fact that it was made of black plastic. To be sure, these facts may be consistent with a gun case. Nonetheless, a black plastic container of such dimensions could easily hold dozens or hundreds of items other than a gun, and so its dimensions and material

are not of an immediately apparent incriminating nature. Probable cause thus was not present, and the plain view exception does not apply. Moving and opening the box was therefore unlawful.

## III. LAWFULNESS OF SEARCH PURSUANT TO WARRANT

Rosado next contends that the search conducted pursuant to the search warrant issued the evening of the search was unlawful, because the affidavit supporting the warrant did not provide probable cause.

### A. Legal Standard

 A search warrant may issue only on a finding of probable cause. *See* U.S. Const. amend. IV. The magistrate must be provided with sufficient facts from which he or she may draw the inferences and form the conclusions necessary to a determination of probable cause. *See Giordenello v. United States,* 357 U.S. 480, 485–86, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). The magistrate "must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause." *Id.* at 486, 78 S.Ct. 1245. The probable cause determination is based upon the totality of the circumstances. *See Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause for a search exists when it is reasonably believed that the evidence sought will aid in the prosecution of a particular offense and the evidence is located in the place to be searched. *See United States v. Lloyd,* 71 F.3d 1256, 1263 (7th Cir.1995). In other words, there must be a nexus between the item to be seized and criminal behavior. *See Warden v. Hayden,* 387 U.S. 294, 306–07, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In addition, there must be probable cause to believe that evidence of the particular criminal behavior has been secreted in specific premises. *See United States v. Harris,* 403 U.S. 573, 584, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). A search warrant affidavit establishes probable cause when

it "sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Roth,* 201 F.3d 888, 892 (7th Cir.2000).

The affidavit must "allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." *United States v. McKinney,* 919 F.2d 405, 415 (7th Cir.1990). It must provide "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Id.*

 The magistrate's determination must be neutral and detached. *See Steagald v. United States,* 451 U.S. 204, 212, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317. Even so, courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than common-sense, manner. *See id.* at 236, 103 S.Ct. 2317.

 Information obtained during a first, unlawful, search may not affect a magistrate's decision to issue a warrant for a second search. *See Murray,* 487 U.S. at 542, 108 S.Ct. 2529. When these conditions are satisfied, great deference is to be accorded to the magistrate judge's determination that probable cause exists. *See United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Indeed, if police conduct a search in good faith pursuant to a facially valid warrant, the resulting evidence may not be suppressed due to an absence of probable cause supporting the warrant. *See id.* at 918–19, 104 S.Ct. 3405. Nonetheless, police may not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity. *See Franks v. Dela-*

*ware,* 438 U.S. 154, 164 n. 6, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). No deference is due to a magistrate judge's determination that probable cause exists where the affidavit on which that determination was based contains a knowing or reckless falsehood. *See Leon,* 468 U.S. at 914, 104 S.Ct. 3405 (citing *Franks*). Omitted facts exhibit deliberate falsehood or a reckless disregard for the truth if the affiant has an obvious reason for the omission. *See United States v. McNeese,* 901 F.2d 585, 594 (7th Cir.1990).

Even if such tainted information is presented to the magistrate, the search warrant is nonetheless valid "if the untainted information supporting the warrant, considered alone, is sufficient to establish probable cause." *United States v. Markling,* 7 F.3d 1309, 1316 (7th Cir.1993).

■■■■■ Where the affidavit relies upon one or more informants, the magistrate judge must undertake "a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." *Gates,* 462 U.S. at 234, 103 S.Ct. 2317. Reliability is based upon the informant's veracity and basis of knowledge. *See id.* at 238, 103 S.Ct. 2317. The magistrate judge's assessment of the informant's reliability should consider: (1) whether the informant made first-hand observations; (2) the degree of detail provided by the informant; (3) whether a law enforcement official independently verified some or all of the informant's information; and (4) whether the informant accompanied the officer to the probable cause hearing and is available to give testimony before the judge issuing the warrant. *See Lloyd,* 71 F.3d at 1263. Even an officer's statement that officials have received reliable information from a credible person and believe that heroin is stored in a home is inadequate to establish probable cause. *See Gates,* 462 U.S. at 239, 103 S.Ct. 2317 (quoting *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). Officers seeking a search warrant relying on information pro-

vided by a confidential informant are under an obligation to take reasonable steps to confirm that information before using it in an affidavit in support of the warrant. *See Jacobs v. City of Chicago,* 215 F.3d 758, 768 n. 4 (7th Cir.2000).

**B. Probable Cause to Support the Search Warrant**

**1. Description of How Gun Case Was Found**

■■■ The affidavit stated that "during their search for people [law enforcement officers] found within plain view a black plastic gun case." This language utterly failed to inform the magistrate judge that the officials' only reason to suspect that the plastic box was incriminating was that it was $4'' \times 8'' \times 2''$ and made of black plastic. It thus misled the magistrate into believing that the plain view exception requirements were satisfied.

In addition, the affidavit appears to have been calculated to mislead. It falsely implied that the search was within the scope of the consent for the initial search and the plain view exception, by emphasizing that the discovery was made "during their search for people [and] within plain view," and yet it wholly omitted that officers identified the plastic box as a "gun case" only after exceeding the scope of the consent by moving the box. There was an obvious reason for omitting these facts; had they been provided, the magistrate judge would have realized that the information was tainted. *See McNeese,* 901 F.2d at 594. The affidavit was thus recklessly false. *See Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. Even though Special Agent Koenig may have been personally ignorant of the falsehood, government agents may not insulate deliberate misstatements merely by relaying them through another officer. *See id.,* 438 U.S. at 164 n. 6, 98 S.Ct. 2674.

I thus must determine whether, setting aside any consideration of the gun box and its contents, the untainted portions of the

affidavit provided probable cause for a search. *See Markling,* 7 F.3d at 1316.

## 2. Reliance on Fact of Indictment

 The affidavit recited that Latin King members had been indicted for many serious crimes. (Aff.¶ 2.) It did not assert that Rosado had been indicted for any crime. No copy of the indictment was attached (despite its assertion to the contrary).

It may be possible, though, that the magistrate judge was aware from other information that Rosado had been indicted on a criminal charge. I must thus consider whether the fact of Rosado's indictment, standing alone, could supply probable cause for a search of his residence. The Seventh Circuit has not addressed this question.

Nonetheless, the Seventh Circuit has held that the magistrate must have a substantial basis to conclude that a search would uncover evidence of wrongdoing. *See McKinney,* 919 F.2d at 415. Probable cause for arrest, without more, will not justify a search warrant. *See Zurcher v. Stanford Daily,* 436 U.S. 547, 556 n. 6, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (quoting LaFave, "Search and Seizure: 'The Course of True Law ... Has Not ... Run Smooth,'" *U. Ill. L.F.* (1966) 255, 260–61 (footnotes omitted)). To be sure, an indictment does supply probable cause for an arrest warrant. *See United States v. Calandra,* 414 U.S. 338, 342–46, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

I find that an indictment does not constitute probable cause to issue a search warrant. The problem with relying upon an indictment to supply probable cause for a search warrant is that it asks the magistrate to subordinate his or her own independent judgment to that of the grand jury, *see United States v. Rubio,* 727 F.2d 786, 795 (9th Cir.1983), and asks the magistrate merely to ratify the bare conclusions of others, rather than to form an independent judgement, in violation of *Gates,* 462 U.S. at 239, 103 S.Ct. 2317.

The magistrate must be detached and neutral, *see Steagald,* 451 U.S. at 212, 101 S.Ct. 1642, but the grand jury's investigative role prevents it from being fully neutral. *See Rubio,* 727 F.2d at 795. *See also United States v. Ellsworth,* 647 F.2d 957, 964 (9th Cir.1981) ("We find no authority for holding, and do not so hold here, that an indictment alone constitutes sufficient probable cause to issue a search warrant.").

If the government has evidence of criminal activity to present to the grand jury, there is nothing to prevent it from disclosing such evidence to the magistrate judge so that he or she can exercise independent judgment. *See Rubio,* 727 F.2d at 795. Disclosing only the fact of indictment is not a substitute for providing the magistrate judge with sufficient facts to form his or her own conclusions necessary to a determination of probable cause. *See Giordenello,* 357 U.S. at 485–86, 78 S.Ct. 1245. Thus, the mere fact that Rosado had been indicted, even if the magistrate judge had been informed of it, did not provide a basis for a search warrant.

As the above discussion indicates, I decline to follow the Eighth Circuit's decision in *United States v. Apker,* 705 F.2d 293, 300–01 (8th Cir.1983). The court there held that the fact of grand jury indictment alone was sufficient to provide the magistrate with probable cause to believe that defendants had engaged in criminal activity, leaving as the only issue for the magistrate to determine for him or herself whether there was probable cause to believe that evidence regarding the crime was likely to be found at the place to be searched. The *Apker* court relied upon a footnote in *Gerstein v. Pugh,* 420 U.S. 103, 117 n. 19, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), which observed that under *Calandra,* 414 U.S. at 342–46, 94 S.Ct. 613, a magistrate must issue an *arrest* warrant without further inquiry upon the strength of a properly issued indictment. However, the principal holding of *Calandra* itself

was that a grand jury may issue an indictment based in part or in whole upon evidence that was illegally gathered. *See Calandra,* 414 U.S. at 351–52, 94 S.Ct. 613. By contrast, a magistrate may not consider illegally gathered evidence in determining whether there is probable cause to support a search warrant. *See Murray,* 487 U.S. at 542, 108 S.Ct. 2529; *Markling,* 7 F.3d at 1316. Moreover, the magistrate "must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause." *Giordenello,* 357 U.S. at 486, 78 S.Ct. 1245. To whatever extent the *Gerstein* footnote may have undermined that requirement, I believe that *Gates* reinstated it when it held that "Sufficient information must be presented *to the magistrate* to allow *that official* to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317 (emphasis added). Because *Gates* was issued two months after *Apker,* the *Apker* court necessarily could not consider it. The mere fact that Rosado had been indicted—even if properly before the magistrate judge, which it does not appear to have been—thus could not supply probable cause for any element of the search warrant determination.

### 3. Listing of Categories of Crimes

 The affidavit detailed many categories of crimes that law enforcement officers alleged that Latin King members had committed, and also alleged that many of these crimes were committed in furtherance of the Latin Kings enterprise itself. (Aff.¶¶ 2(i)—2(k); 3.) The latter allegation, as we will see, helps establish probable cause for one element of RICO. Nonetheless, the affidavit did not even assert, much less give the magistrate judge reason to form an independent judgment, that Rosado had committed crimes; had aided or abetted others in committing crimes; or (with the exception of asserting that a search was likely to find evidence of RICO violations (*id.* ¶ 9), discussed below) that Rosado's residence had any link to the

commission of crimes. The listing of categories of crimes that Latin King members had allegedly committed thus did not provide the magistrate judge with probable cause to believe that evidence was located in the place to be searched or that the evidence sought would aid in the prosecution of a particular offense. *See Lloyd,* 71 F.3d at 1263.

### 4. Assertion of Likelihood of Finding Latin King Writings

 The affidavit asserted that it was believed that a "Latin King Manifesto," a Latin King book of rules and laws, membership lists, telephone numbers, dues lists, and legal papers useful for intimidating witnesses would be found in Rosado's residence. But the affidavit did not give the magistrate judge any facts from which he could draw the inferences and form the conclusions necessary to a determination of probable cause. *See Giordenello,* 357 U.S. at 485–86, 78 S.Ct. 1245. The affidavit did not assert that Rosado was a Latin King leader, officer, or treasurer, and provided no other reason to believe that his residence would have copies of the organization's manifesto, roster, dues lists, or other material. The assertion that it was believed that Latin King writings would be found at Rosado's residence thus did not provide probable cause for a search.

### 5. Description of Common Characteristics of Narcotics Traffickers

 The affidavit summarized many telling characteristics and common behaviors of narcotics traffickers, and indicated that incriminating evidence of narcotics crimes is often to be found in narcotics traffickers' residences. (Aff.¶ 5.) Where an affidavit provides reason to believe that a particular person is a narcotics distributor, the affidavit's further generalization that such distributors often keep drugs, implements of distribution, records, and proceeds in their residences is sufficient to provide probable cause to believe that the

person's premises would contain evidence. *See McNeese*, 901 F.2d at 596; *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir.1996) ("a magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept[;] in the case of drug dealers evidence is likely to be found where the dealers live") (quotation marks and citations omitted).

In this case, however, the affidavit did not assert, much less provide reason to believe, that Rosado was a narcotics distributor or drug dealer; that he aided or abetted others who were; that he exhibited any traits or behaviors characteristic of narcotics traffickers; or that any characteristics common to narcotics traffickers' residences had been found at his residence. Indeed, this entire paragraph of the affidavit appears to be a non sequitur; it is unconnected to anything else in the affidavit, and nothing at all ties it to Rosado or his residence. The summary of common characteristics of narcotics traffickers and their residences gave the magistrate judge no basis to believe that incriminating evidence of narcotics crimes would be found at Rosado's residence.

### 6. Informants' Claims Relating to Firearms Being Stored at Residences

 The affidavit asserted that unnamed informants claimed that Latin King members often used firearms to commit violent crimes and stored them at their residences. (Aff.¶ 6.) The affidavit stated nothing about the informants' reliability, veracity, or basis for knowledge. *See Gates*, 462 U.S. at 236, 103 S.Ct. 2317. It did not state whether the informants made first-hand observations, or whether law enforcement officials independently verified some or all of their claims about firearms. The bare assertion that Latin King members often used firearms in crimes and stored them at their residences provides little detail. There is no evidence that any informants accompanied Special Agent Koenig to the probable cause hearing or

were available to give testimony before the magistrate judge. *See Lloyd*, 71 F.3d at 1263. Officers seeking to rely on an informant's statements have an obligation to confirm the statements before seeking a search warrant, *see Jacobs*, 215 F.3d at 768 n. 4, but there is no evidence that officers made any attempt to confirm the assertions here. Accordingly, this portion of the affidavit provided the magistrate judge with no basis to believe that evidence of violent crimes or firearms would be found at Rosado's residence.

### 7. Gun Case

As discussed above, officers discovered what proved to be a gun case containing bullets only through a search that violated the scope of the consent they had been given and that did not satisfy the requirements of the plain view exception. Because the discovery of the gun case and bullets was tainted, they cannot be considered in assessing the magistrate's decision to issue a warrant for a second search. *See Murray*, 487 U.S. at 542, 108 S.Ct. 2529. I must assess whether the untainted information supporting the warrant, considered alone, is sufficient to establish probable cause. *See Markling*, 7 F.3d at 1316.

### 8. Indicia of Membership in Latin Kings

The affidavit cited the presence in the attic of Rosado's residence of clothing in the Latin Kings' colors. (Aff.¶ 7.) This evidence properly allowed the inference that Rosado might be associated with or a member of the Latin Kings. The question presented is thus whether this inference is adequate to establish "probable cause for believing the occurrence of a crime and the secreting of evidence in specific premises." *Harris*, 403 U.S. at 584, 91 S.Ct. 2075. I first consider whether evidence of gang membership, standing alone, is sufficient to create probable cause; and then whether evidence of association with a RICO-

accused enterprise, standing alone, is sufficient.

### a. Gang Membership

▆▆▆▆ The mere fact, or even allegation, of gang membership carries a strong taint of criminality. ₁See *Gardner v. Barnett,* 175 F.3d 580, 589 (7th Cir.), *rev'd on rehr'g en banc,* 199 F.3d 915 (7th Cir.1999). In a proper case, evidence of gang membership may be admitted to show motive, a reason for participation, joint ownership of firearms, or a relationship between witnesses; for purposes of impeachment and showing bias; to explain parties' actions, to help the jury understand the dynamics at work in a given case; and to support conspiracy or joint venture theories. *See United States v. Butler,* 71 F.3d 243, 251 (7th Cir.1995); *United States v. Rodriguez,* 925 F.2d 1049, 1053–54 (7th Cir. 1991); *United States v. Lewis,* 910 F.2d 1367, 1372 (7th Cir.1990) (citations omitted). But for gang membership to be evidence of, say, a suspect's motive or reason for participating in an offense, there must be some independent evidence that the suspect committed the offense. An affidavit must provide "a substantial basis for concluding that a search would uncover evidence of *wrongdoing.*" *McKinney,* 919 F.2d at 415 (emphasis added). Information about a group's reputation is legally insufficient to support probable cause that a member of that group is involved in criminal activities. *See Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1295 (9th Cir.1999). Thus, a mere inference of gang membership, without more, provides no basis for concluding that a search would uncover evidence of wrongdoing.

The First Amendment protects individuals' right of free association. Gang membership is not a crime. The right of free association is impinged upon even by laws prohibiting gang membership plus certain kinds of conduct, for example, gang membership plus loitering. *See City of Chicago v. Morales,* 527 U.S. 41, 53, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (opinion of Stevens, J.).

▆▆▆ Thus, even though the presence of Latin Kings-color clothing in Rosado's attic might allow probable cause to believe that Rosado was a Latin King member, it would not, without more, allow the inference that Rosado had committed a crime. A search warrant may issue only on a finding that evidence is likely to be found that will "aid in the prosecution of a *particular offense.*" *Lloyd,* 71 F.3d at 1263 (emphasis added). The mere assertion that the Latin Kings is a criminal gang would not convert Rosado's membership in the Latin Kings, even if true, into probable cause to believe that Rosado was guilty of any particular offense, much less probable cause to believe that evidence of a particular offense would be at his residence.

### b. Association with an Accused RICO Enterprise

▆▆▆▆ RICO applies both to formal and informal enterprises, including criminal gangs, *see United States v. Korando,* 29 F.3d 1114, 1117–18 (7th Cir.1994), and wholly criminal enterprises, *see United States v. Turkette,* 452 U.S. 576, 587, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The affidavit accused the Latin Kings of being an association-in-fact enterprise under the RICO statute, 18 U.S.C. § 1961(4). I therefore next consider whether the black and gold clothing, indicating a possible association with a RICO-accused enterprise, could provide "probable cause for believing the occurrence of a crime and the secreting of evidence in specific premises," *Harris,* 403 U.S. at 584, 91 S.Ct. 2075, and thereby justify a search warrant.

As a preliminary matter, Rosado emphasizes that he was not named in the indictment's RICO count. He accordingly contends that the government may not justify the search warrant by pointing to RICO. This contention is mistaken, because a search warrant requires only probable cause to believe that the evidence sought will aid in the prosecution of a particular

offense and that the evidence sought is located in the place to be searched. *See Lloyd*, 71 F.3d at 1263. There is no requirement that, before the government may apply for a search warrant, it must already have sufficient evidence to yield an indictment against a given suspect, much less that a grand jury must have completed its deliberations and issued an indictment.

Under RICO, it is a crime for a person (1) associated with an enterprise (legal or illegal) (2) to conduct or participate in the conduct of the enterprise's affairs, directly or indirectly, (3) through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c). A "pattern of racketeering activity" is defined as two or more enumerated predicate crimes. *Id.* § 1961(1), (5).[5]

To satisfy § 1962(c)'s "associated with an[ ] enterprise" requirement, the government must introduce "evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. "Associational" evidence therefore is needed to establish a RICO violation under § 1962(c), and such evidence thus demonstrates one element of a crime. For this reason, RICO charges under § 1962(c) implicate First Amendment interests. *See National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 264, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (Souter, J., concurring).

To protect RICO suspects' right to freedom of association, search warrants issued on the strength of suspected § 1962(c) violations must be narrowly drawn. *See Rubio*, 727 F.2d at 792. As discussed above, the magistrate must have probable cause to believe that a search warrant will "aid in the prosecution of a *particular offense*." *Lloyd*, 71 F.3d at 1263 (emphasis added). The question presented is thus when, if

ever, someone's association with an enterprise whose affairs have been conducted through a pattern of racketeering activity provides probable cause to believe that the particular offense of a § 1962(c) violation may have occurred, that is, that the person may have helped participate in conducting the affairs of the enterprise and have engaged in two or more predicate acts.

*Rubio* is the leading case, and provides the rule that "[i]f such a large portion of the subject organization's activities are illegitimate so that the enterprise could be considered, in effect, wholly illegitimate, then there would certainly be cause to believe that evidence of a suspect's association with that enterprise would aid in a RICO conviction." *Rubio*, 727 F.2d at 793. In other words, where an association is not in effect wholly illegitimate, a search warrant must be supported by some additional nexus between association with the organization and an alleged pattern of racketeering activity. *See id.* at 792.

In *Rubio* itself, the court found that because the suspects, indicted Hell's Angels Club members, pursued legitimate activities through the club, including an auto body shop, and because the affidavit did not establish probable cause to believe that any suspects had committed crimes, there was not sufficient reason to believe that evidence of a pattern of racketeering activity could be found at a given associate's or member's premises. "Something more must be demonstrated; otherwise, the Fourth Amendment would offer little protection for those who are innocently associated with a legitimate enterprise, the affairs of which are being conducted by others through a pattern of racketeering activity." *Id.* at 793.

---

**5.** It is also a crime to conspire to violate § 1962(c). *See id.* § 1962(d). An allegation under § 1962(d) that a suspect conspired to violate § 1962(c), though, requires evidence that the suspect personally facilitated the activities of those who operated or managed the enterprise. *See Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir.),

*cert. denied* —— U.S. ——, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). On that basis, the inference from clothing to probable cause of a violation under § 1962(d) of conspiracy to violate § 1962(c) is no easier to make than the inference from clothing to probable cause of a violation of § 1962(c). I therefore do not discuss § 1962(d) separately.

*Rubio*'s analysis was accepted, and applied to a different fact pattern, in *United States v. Killip*, 819 F.2d 1542, 1550 (10th Cir.1987). In that case, the Tenth Circuit found that the affidavit provided probable cause to believe that the Outlaws Motorcycle Club was a RICO enterprise. It accordingly found that the affidavit supplied "the missing element in *Rubio*, probable cause to believe that the evidence sought is connected with a violation of the RICO statute." *Id.*[6]

No decision of the Seventh Circuit has cited *Killip*, and *Rubio* has been cited only on other topics.[7] Another court in this district declined to apply *Rubio* in an Outlaws Motorcycle Club case, but only on the ground that the search warrant in that case was protected by the *Leon* good-faith exception. *See United States v. O'Neill*, 27 F.Supp.2d 1121, 1144 (E.D.Wis.1998) (Stadtmueller, C.J.).

Because of the link between the Latin Kings colors and the clothing observed in the attic, there was probable cause to believe that whoever the clothing belonged to was associated with and participated, directly or indirectly, in the conduct of Latin Kings' affairs. The affidavit in this case, in contrast to that in *Rubio*, provided extensive information regarding the alleged criminal activities of the organization, as well as detailed information about the organization's reliance upon criminal acts to further its purposes. According to the affidavit, Latin King members not only committed serious criminal acts, including murder and arson, but committed predicate acts for the purpose of benefitting the enterprise, including the murder of rival gang members; the murder of suspected government informants; and arson against the person and properties of rival gangs

and potential adverse witnesses. On that basis, the affidavit provided probable cause to believe that such a large portion of the Latin Kings' activities were illegitimate that the enterprise could be considered in effect wholly illegitimate. *See Rubio*, 727 F.2d at 793. On that basis, under the *Rubio* standard, association with the Latin Kings was sufficient to establish probable cause to believe that the person whose Latin King-color clothing was in Rosado's attic was not only associated with the Latin Kings, but also had participated in the conduct of the Latin Kings and (because such a large portion of its activities were illegitimate) had committed predicate acts. Thus, there was probable cause that someone—whoever owned the clothing—had violated § 1962(c). On that basis, evidence of that person's association with the Latin Kings—the Latin Kings-color clothing— would help prove the associational element needed to secure a conviction under § 1962(c). This then satisfies the first prong of *Lloyd*, that there must be a particular offense and that the evidence sought must be linked to it. *See Lloyd*, 71 F.3d at 1263. *Lloyd*'s second prong, requiring probable cause to believe that the evidence would be found in the place to be searched, *see id.*, is easily satisfied by the affidavit's statement that officers observed the Latin Kings-color clothing in the attic of the residence. On that basis, even after setting aside the tainted evidence regarding the gun case, the search warrant for Rosado's residence was supported by probable cause.

**NOW THEREFORE, IT IS HEREBY ORDERED** that the magistrate judge's recommendation (Docket # 1027) is

---

**6.** *Killip*'s reasoning is repeated verbatim in *United States v. Gruber*, 994 F.Supp. 1026, 1040 n. 4 (N.D.Iowa 1998). Although not a RICO case, *Huebner v. United States*, 731 F.Supp. 1441, 1443 (D.Ariz.1990), applied *Rubio*'s reasoning and found that the search warrant there was valid, because the affidavit established probable cause that the suspect

for whose residence the warrant was sought had committed particular offenses.

**7.** *See United States v. Betts*, 16 F.3d 748, 755 (7th Cir.1994), *overruled on other grounds by United States v. Mills*, 122 F.3d 346 (7th Cir. 1997); *United States v. Josefik*, 753 F.2d 585, 588 (7th Cir.1985).

**ADOPTED,** and that defendant Rosado's motion (docket # 785) is **DENIED.**