**UNITED STATES of America,**

**v.**

**Scott KUNEN, Paul Alexander, Frank Bellavia, and George Stephens, Defendants.**

Nos. 02–CR–326, 02–CR–1388, 02–CR–734, 02–CR–2965 (DRH).

United States District Court,
E.D. New York.

June 16, 2004.

Roslynn R. Mauskopf, Esq., United States Attorney, Eastern District of New York, Central Islip, NY, By Gary R. Brown, A.U.S.A., for the Government.

Ambrose W. Wotorson, Esq., Brooklyn, NY, for Defendant Scott Kunen.

Thomas Liotti, Esq., Garden City, NY, for Defendant Paul Alexander.

Tracey L. Eadie Gaffey, Esq., Federal Defenders Division, Central Islip, NY, for Defendant Frank Bellavia.

Joseph Trainor, Esq., Rockaway Park, NY, for Defendant George Stephens.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before the Court are motions by Scott Kunen ("Kunen"), Paul Alexander ("Alexander"), Frank Bellavia ("Bellavia"), and George Stephens, ("Stephens") to suppress child pornography seized upon the execution of search warrants at their respective homes. The grounds advanced by each defendant are essentially the same, viz., that information in the affidavit submitted in support of the application for the search warrant was either (a) known by the FBI agents involved to be false or (b) the product of the agents' reckless disregard for the truth and that, absent the tainted information, the application did not establish probable cause.

## BACKGROUND

### 1. Background Information Common to all Defendants

Defendants are charged in separate indictments with, inter alia, the possession of child pornography in violation of 18 U.S.C. Section 2252A.

The government conducted a multi-state child pornography investigation targeting subscribers to an Internet e-group called "The Candyman" ("Candyman"). The Candyman web page description read:

"This group is for People who love kids. You can post any type of messages you like too and any type of pics and vids you like too. P.S. IF WE ALL

WORKED TOGETHER WE WILL HAVE THE BEST GROUP ON THE NET."

Defendants were subscribers to Candyman. So also was FBI Agent Geoffrey Binney ("Binney") who joined as part of the government's investigation. As a member, Binney received reams of child pornography from other members. Binney told FBI agent Austin Berglas ("Berglas") everything he received was also received automatically by all Candyman members. Berglas, in turn, incorporated that information into each of the Candyman search warrant applications presented in the four captioned cases, thusly:

> [A]ll new members of the Candyman E-group were immediately added to a Candyman E-group e-mail list. Every Candyman E-group member on the Candyman E-group e-mail list automatically received every e-mail message and other file transmitted to the Candyman E-group by any Candyman E-group member.

*See, e.g.,* Para. 24, Berglas Aff. Supp. of Search Warrant Application for 24 Lake Drive, Ronkonkoma, New York (Bellavia's home).

It was subsequently discovered, however, that Binney's pivotal representation to Berglas was false, and that persons who subscribed to Candyman via the website had several e-mail options including receiving no member e-mails at all. Indeed, it appears that the *"vast majority* of subscribers ... elected to receive no e-mails." *United States v. Perez,* 247 F.Supp.2d 459, 482–83 (S.D.N.Y.2003) (emphasis added).

The government, upon learning of the error, notified Candyman defendants throughout the country, including Kunen, Alexander, Bellavia and Stephens. Following such notification, the current motions were made.

2. *Memorandum and Order of This Court Dated May 23, 2003*

Defendants Kunen and Alexander moved earlier than Bellavia and Stephens to suppress the child pornography retrieved from the computers in their respective homes. The Kunen and Alexander motions resulted in a decision dated May 23, 2003, wherein the Court concluded that: (1) the fact that the false information in the search warrant application did not originate with the affiant FBI agent, but rather with another agent, is irrelevant, (2) the good faith exception under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) is inapplicable, and (3) absent the erroneous information, the search warrant affidavits were insufficient to establish probable cause.[1]

The Supreme Court, in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1970), explained, however, that erroneous information in a search warrant application should not be deleted for probable cause analytical purposes unless the affiant knowingly presented false information to the issuing judge, or presented the information with a reckless disregard for its truth. To determine whether either of those circumstances was present, the Court scheduled the matter for a hearing. That hearing was held on August 28, 2003.

In the interim between the time Kunen and Alexander made their motions and the time of the scheduled hearing, defendants Bellavia and Stephens moved to suppress the items of physical evidence seized from

---

**1.** Since the Court's decision of May 23, 2003, (which is incorporated by reference), two Circuit courts have reached a contrary conclusion; those decisions will be discussed subsequently.

their homes on the same grounds contained in the Kunen and Alexander applications. Accordingly, upon consent of all interested parties, the four cases were consolidated for purposes of the August 28, 2003 hearing.

### 3. *August 28, 2003 Hearing*

By August 2003, Binney, and the agent who took over the Candyman investigation from him, Special Agent Kristen Sheldon ("Sheldon"), had already testified in numerous proceedings throughout the country where the central issue was whether the erroneous information from Binney represented an intentional falsehood or was the product of a reckless disregard for the truth. The government, and each defendant agreed that rather than calling one or both witnesses in the hearing before me, the Court would be furnished with their testimony from the following proceedings which would then serve as the hearing record:

| | | | |
|---|---|---|---|
| 1. | 3500–GB–50 | Detention Hearing Testimony, Southern District of Texas, 03–22–02 | S/A Geoffrey Binney |
| 2. | 3500–GB–51 | Hearing Testimony, Eastern District of Missouri, 07–17–02 | S/A Geoffrey Binney |
| 3. | 3500–GB–52 | Suppression Hearing Testimony, Southern District of Texas, 08–08–02 | S/A Geoffrey Binney |
| 4. | 3500–GB–53 | Franks Hearing Testimony, Southern District of New York, 01–15–03 | S/A Geoffrey Binney |
| 5. | 3500–GB–54 | Evidentiary Hearing Testimony, District of Nevada, 04–08–03 | S/A Geoffrey Binney |
| 6. | 3500–KS–1 | Grand Jury Testimony, Southern District of Texas, 03–15–02 | S/A Kristen Sheldon |
| 7. | 3500–KS–2 | Detention and Arraignment Testimony, Southern District of Texas, 03–20–02 | S/A Kristen Sheldon |
| 8. | 3500–KS–3 | Detention Hearing Testimony, Eastern District of Texas, 03–21–02 | S/A Kristen Sheldon |
| 9. | 3500–KS–4 | Hearing Testimony, Southern District of Texas, 08–08–02 | S/A Kristen Sheldon |
| 10. | 3500–KS–5 | Grand Jury Testimony, Southern District of Texas, 04–12–02 | S/A Kristen Sheldon |
| 11. | 3500–KS–6 | Hearing Testimony, Eastern District of Missouri, 07–17–02 | S/A Kristen Sheldon |
| 12. | 3500–KS–7 | Hearing Testimony, Southern District of New York, 02–19–03 | S/A Kristen Sheldon |
| 13. | 3500–KS–8 | Evidentiary Hearing Testimony, District of Nevada, 04–08–03 | S/A Kristen Sheldon |

## DISCUSSION

### 1. Defendants' Position

Defendants argue that the false information provided by Binney was either intentionally false or found its way into the search warrant applications in the Candyman cases, including the four now under discussion, due to a reckless disregard for the truth by Binney and Sheldon.

### 2. Government's Position

The government not only espouses a contrary position, but argues that the four cases are materially distinguishable inter se and must be analyzed accordingly.

The search warrants in *Alexander, Kunen* and *Stephens* were executed on November 16, 2001.[2] The execution dated for the *Bellavia* warrant was March 6, 2002.[3] The FBI's level of awareness of Binney's error was significantly enhanced during that almost four month interim period. Implicit in the government's position is that even if the application in *Bellavia* is deemed, arguendo, to be the product of a reckless disregard for the truth, the same may not be said of the three applications made, and warrants executed in November 2001.

### 3. Opinion Format

As noted, the purpose of the August 23, 2003 hearing was to determine whether the Binney e-mail information should be stricken from the four warrant applications. That determination depends on the attendant circumstances. Since those circumstances are not temporally the same as to all four warrants, the Court will consider the motions to suppress separately, beginning with the motion made by Bellavia.

A brief overview of the factual background common to all four defendants was provided earlier. In the individual portions of the opinion which follow, greater factual specificity will be furnished insofar as relevant to the respective motions to suppress.

Before addressing the respective motions to suppress, a definition of "reckless disregard" in the *Franks* context is required.

### 4. Franks v. Delaware Standard; What Constitutes a Reckless Disregard for the Truth

The question before the Supreme Court in *Franks v. Delaware* was whether "a defendant in a criminal proceeding ever [has] the right, under the Fourth and Fourteenth Amendments, subsequent to *ex parte* issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant"? *Franks*, 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The Supreme Court of Delaware had held that under no circumstances could a defendant mount such a challenge. The Supreme Court reversed, holding "that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the alleged false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. 2674.

---

**2.** The search warrant affidavits in *Alexander, Kunen* and *Stephens* were each signed by the affiant on November 9, 2001.

**3.** The affiant for the *Bellavia* application signed his affidavit on March 1, 2002.

The meaning of an intentional falsehood is self.evident. The same may not be said of what constitutes a reckless disregard for the truth. The term is not explained in the decision beyond indicating that it is something more than mere negligence on the part of the affiant.[4] *Id.* at 171, 98 S.Ct. 2674.

The Second Circuit has not addressed the issue. The Eighth Circuit has explained "that the test for determining whether an affiant's statements were made with reckless disregard for the truth [is] . . . whether, viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his (or her) statements or had obvious reasons to doubt the accuracy of the information he (or she) reported." *United States v. Schmitz,* 181 F.3d 981, 986–87 (8th Cir. 1999).

"[M]ost Circuits [that have had occasion to address the issue] have adopted a subjective test for recklessness similar to that used in first Amendment liable cases." *United States v. Cican,* 63 Fed.Appx. 832, 835 (6th Cir.). Under that standard the question is not what a reasonably prudent person would have appreciated given the attendant circumstances but rather whether the defendant "in fact entertained serious doubts as to the truth" of the subject statements. *Id.; see United States v. Ranney,* 298 F.3d 74, 78 (1st Cir.2002) ("to prove reckless disregard for the truth, the defendant must prove that the affiant 'in fact entertained serious doubts as to the truth' of the allegations," quoting *United States v. Williams,* 737 F.2d 594 602 (7th Cir.1984)); *United States v. Davis,* 617 F.2d 677, 694 (D.C.Cir.1979). Although

the commonly used standard is subjective, "[r]ecklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations." *United States v. Ranney,* 298 F.3d at 78 (internal quotation marks and citation omitted).

■ Given the lack of guidance from the Supreme Court or the Second Circuit, this Court will adopt the above described subjective standard in determining whether the inclusion of the Binney misinformation in the search warrant applications was, if not an intentional falsehood, the result of a reckless disregard for the truth. "This a tougher test than the objective 'knew or should have known' standard used in Tort and [some] other cases." *United States v. Strauser,* 247 F.Supp.2d 1135, 1138 (E.D.MO.2003).

### 5. *Bellavia Motion to Suppress*

Bellavia is charged in a ten count indictment with knowingly and intentionally possessing materials containing images of child pornography in violation of 18 U.S.C. Sections 2252A(a)(5)(B) and 2252A(b)(2). On March 6, 2002, at approximately 6:40 a.m., federal agents executed a search warrant at the home he shared with his wife Elizabeth at 24 Lake Drive, Ronkonkoma, New York.

Based on the information known to the government as of the date of the search warrant's execution, to wit March 6, 2002, the Court concludes that both Binney and Sheldon had serious doubts as to the accuracy of the pivotal "all subscribers receive

---

**4.** It is well established that the police cannot insulate a deliberate or reckless falsehood by one of its officers from a *Franks* inquiry by relaying the information through another member of the force who is unaware of the falsehood and serves as the affiant. *Franks v.*

*Delaware,* 438 U.S. 154, 164 n. 6, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Therefore, the fact that the erroneous information originated with Binney, rather than with the affiant, Berglas, is of no moment.

all e-mails" statement. The reasons for that conclusion are as follows:

### A. Bases for Binney's Conclusion That Every Subscriber Received Every E-mail

Binney testified that the bases for his assertion that all Candyman subscribers received all e-mails are: (i) his experience as a member of Candyman; (ii) a conversation with a Yahoo paralegal, Lauren Guarnieri ("Guarnieri"); and (iii) the first set of logs provided by Yahoo in response to FBI subpoenas. January 15, 2003 Hr'g in *United States v. Harvey Perez*, 02 CR 854 (S.D.N.Y., Chin, J.) ("Tr.") at 44; 60. Each of these basis will be addressed in turn.

### i) Binney's Experience as a Subscriber to Candyman

In an affidavit dated July 1, 2002, Binney explained that he joined Candyman thusly:

I joined the Candyman E-group on January 2, 2001. I accomplished this by following several steps. First, I went to the Handyman [sic] website and copied the E-mail address of the moderator, which was listed on the web page. I then left the website, went to my web mail provider, and sent an E-mail to the Candyman moderator asking to join the group. During this entire process, I weas [sic] never given any opportunity to select any mail delivery options. Nor was there any mention of such options during the joining phase.

Exh. N to Bellavia's Not. of Motion, ¶ 4.

Binney acknowledged that he testified "several times" consistent with his July 1st affidavit. Tr. at 52. Indeed, there is nothing to suggest that he ever testified in a different fashion. In fact, the affidavit was prepared after Binney became aware that Candyman defendants were challenging the "all subscribers received all e-mails" assertion in the search warrant applications. As explained by Binney, "[t]hat's what prompted [the] affidavit." *Id.* at 54. Binney's position has been that, as an e-mail subscriber, he was never made privy to the various e-mail delivery options, thus triggering his belief that all members received all e-mails.

Binney was trained to keep copies of all e-mails sent during the course of an investigation. *Id.* at 64. Nonetheless, he has no copy of the e-mail he claims to have sent to the moderator of Candyman as part of the process of joining nor does he have any explanation for this purported oversight. *Id.* Additionally, Binney's claimed joining of Candyman via e-mail is not reflected in an FBI 302 report (id. at 65), even though he must have appreciated that he would be called upon to testify as to this pivotal issue.

It is not surprising that a copy of the e-mail was not retained, or that the information is not to be found in a 302 report, given that the information in Binney's July 1, 2002 affidavit, and the concomitant testimony he gave in a number of cases, is simply untrue. Not only do the Yahoo records indicate that he subscribed by the web, and, accordingly, was provided with the various e-mail options (including the option of receiving no e-mail), but that conclusion is confirmed by the FBI's Cyber Division reports of December 12, 2002. *See United States v. Perez*, 247 F.Supp.2d 459, 466 (S.D.N.Y.2003).

A review of Binney's testimony in the numerous proceedings contained in the hearing record indicates that he was no stranger to the internet or to e-mail during the relevant time period. Accordingly, any purported misperceptions on his part upon joining Candyman and/or thereafter, cannot be explained as errors of a neo-

phyte. Additionally, Binney not only joined Candyman via the web but also several other sites in the same manner as part of his undercover child pornography operation. Tr. 49, 50 (Binney joined "three" e-groups as part of this "investigation [and possibly] one or two more"); *see also* Bellavia Exh. I, the "McGoff Stipulation," ¶s 9, 10. Yahoo logs indicate that Binney joined "at last two other [child pornography] groups ... 'Shangri-la' and 'Girls—16–18'—in the same manner [i.e. through the main web page," *id.* at ¶ 9][5] and *Perez*, 247 F.Supp.2d at 479 ("Binney was presented with e-mail delivery options when he joined **Candyman** and he was presented with those options again on six other occasions when he joined other websites.").

In sum, Binney joined Candyman over the web, not via e-mail. As a result, he was presented with three e-mail delivery options, including the option of not receiving copies of e-mails sent between or among other members. Given that he received copies of hundreds of e-mails, he obviously did not select the "no e-mail option," unlike the majority of the Candyman subscribers. Which is to say, the first basis for Binney's belief that "every member received every e-mail" is belied, not supported, by his "experience."

Attention will now be directed to Binney's conversation with Guarnieri.

### ii) *Binney's Conversation with Guarnieri*

The second basis for Binney's belief is a conversation he had with Yahoo employee Guarnieri.

Binney contacted Yahoo on January 19, 2001 "basically to find out what they had,

what this group was all about, what kind of information did they have that I could get, what could I get if I served them with a subpoena, what could I get if I served them with a court order or search warrant or whatever." Tr. at 31. He spoke with Guarnieri who he reports "couldn't have been really any more unhelpful than she was." *Id.* at 32. It soon became apparent to Binney that she was "either not knowledgeable about what they had or wasn't willing to tell me." *Id.* He then asked to speak to a "technical representative," which request was similarly rebuffed by Guarnieri with the comment "you will never speak to a technical representative." *Id.* Nonetheless, armed with a list of Candyman members as of the date Yahoo shut down the Candyman website, to wit February 6, 2001, Binney reports that he asked Guarnieri -

> "something about [whether the other members on the list were] about the same as me. I don't recall exactly the context, but it was basically to get a confirmation from her that they were the same types of members that I was."

*Id.* at 38.

He made this inquiry because he wanted to determine that -

> "if I had an e-mail from Joe at AOL.com on January 10, was it safe to say that they received the same e-mails I did between the 10th and the day [the site] shut down?"

*Id.* at 37.

Binney's testimony concerning his conversation with Guarnieri is difficult to decipher. It seems he called her for the purpose of determining "start dates and end dates and things like that" with respect to individuals who were members as of the

---

**5.** Although Exh. I is unsigned and marked as a "Draft," the government has not contested its authenticity.

date the site was closed. *Id.* As noted by Judge Chin in *Perez,* "it was in that context" that he asked her the above question. *Perez,* 247 F.Supp.2d at 471.

Did Binney indicate that in referring to "people like [him]" that he joined the site by e-mail? If so, Guarnieri's purported affirmative answer might be correct. But without more information, it cannot be determined what information prompted her response. Under the circumstances, including that she was reported by Binney to be a highly uncooperative, non-technical, non-knowledgeable person it is unlikely that Binney put much stock in her answer. Indeed, Binney himself recognizes that his conversation with Guarnieri provides a scant, if any basis, for his mistaken belief. Tr. at 44 ("it [the assertion that all Candyman members received all e-mails] was almost entirely based on my experience in the site, [and] very little bit based on a conversation that I had with Ms. Guarnieri....."). Incidentally, no 302 report was prepared evidencing the purported Binney/Guarnieri conversation.

### iii) First Set of Logs Provided by Yahoo in *Response to FBI Subpoenas*

The third basis for Binney's assertion that all Candyman members received all e-mails is the "first set of logs the FBI obtained in August or so of 2001." *Id.* at 44. Binney testified that there was no indication in the logs of any e-mail delivery options, thus confirming his belief that no such options existed. *Id.* at 88–89.

By way of background, Sheldon replaced Binney as the Candyman case agent in April 2001.[6] After serving several grand jury subpoenas on Yahoo—as Binney had done before her—and receiving, as he had, incomplete responses, Sheldon obtained a court order directing Yahoo to furnish various logs[7]. Yahoo produced those logs before Judge Chin on August 30, 2001.

Sheldon testified, like Binney, that the logs, appeared to be all inclusive and were silent on e-mail options. *Id.* at 117–18. Sheldon maintains that she did not become aware until May of 2002 that not all Candyman members received all e-mails. *Id.* at 128. Binney testified before Judge Chin in January 2003 that "we now know" that the critical e-mail information he had inserted in the model search warrant applications was "probably ... not correct." *Id.* at 69. Precisely when prior to January of 2003 he appreciated that probability cannot be gleaned from the record.

Binney's and Sheldon's claimed belated awareness of the e-mail delivery options is problematic given other contacts that Sheldon had with Yahoo, including:

(a) On January 18, 2002 Yahoo furnished to Sheldon a number of documents including "Yahoo's Group Administration Profiles" for Candyman. "In a category for 'Number of Subs[cribers]', the document reports: 3213 Normal (single: 413,

---

**6.** Binney, nonetheless, remained involved in the investigation as evidenced by, inter alia, his testimony before Judge Chin in *United States v. Perez,* 247 F.Supp.2d 459 (S.D.N.Y. 2003) in which he explained that "we [ (presumably, he and Sheldon) did not] pay much attention" to Candyman moderator Mark Bates' ("Bates") statement to Sheldon in March 2002 that subscribers had various e-mail delivery options, including the option of receiving no e-mail copies. Tr. at 73; *see also id.* at 70 (Sheldon told Binney that Bates informed her of the no e-mail option; thereaf-

ter Binney attended, with the assigned A.U.S.A., a discovery conference with several Candyman defense attorneys).

**7.** Sheldon defines a "log file" as " massive data ... that indicates dates times and e-mails addresses and then different actions that would have occurred within the group." Mar. 21, 2002 Tr. in *United States v. Mark Bates,* Docket No. 6:02m20 (E.D. of Texas, Tyler Division) at 13–14.

Digest: 60, No Mail: 2740)". *United States v. Perez,* 247 F.Supp.2d at 485; *see also* Tr. at 130, 139. While it may be that the categories "Single" and "Digest" may not be readily understandable, the same may not be said of the last notation concerning "No Mail: 2740." A fair reading of that notation indicates that of the total number of subscribers, to wit 3213, 2740 were to receive no e-mails.

To partially reiterate, the Yahoo material furnished to Sheldon in January of 2002 demonstrated that not all members received all e-mails and, in fact, the vast majority did not.

(b) Sheldon met for six hours with two representatives of Yahoo on January 24, 2002. Although Sheldon professed not to "know the definitions" of the terms in the Yahoo records received less than a week before—such as the term "No Mail"—she never broached the subject with the Yahoo representatives. Tr. at 136.

The January 24th meeting is significant for another reason as well. Sheldon was told that Candyman subscribers under Yahoo had a no mail option. However, the website was transferred from E–Group, Inc. to Yahoo in "approximately August or September 2000". Bellavia's Exh. J at 4 (Tr. of Test. of Mark Hull given in *In re: Daniel McDermott*). This prompted Sheldon to ask whether there were also e-mail delivery options under E–Groups, Inc. The representatives from Yahoo did not know the answer whereupon Sheldon told them to please report back to her with that information. Notwithstanding this pivotal "open question," Sheldon continued to send the template search warrant materials, with its bogus representation that all members receive all e-mails, to FBI field offices throughout the country for use in

obtaining search warrants. One of the many individuals ensnared by this flawed process was Bellavia.

Parenthetically, the "dam the torpedoes, full speed ahead" mentality is further evidenced by the FBI's conduct following Sheldon's late March 2002 interview with Bates, the moderator of the Candyman e-group. Although what Bates told Sheldon postdated by several weeks the execution of the Bellavia search warrant on March 6, 2002,[8] it is nonetheless reflective of the mind-set of both Binney and Sheldon.

Bates informed Sheldon that Candyman members could elect to receive no e-mails. Yet, two days later, Sheldon, as she explained during cross-examination before Judge Chin, testified categorically at a detention hearing in Texas that all members received all e-mails. Tr. at 141–43. Sheldon testified that she did not believe Bates because, inter alia, the information he provided was inconsistent with what Binney had told her. *Id.* at 143–14. Binney similarly explained to Judge Chin that "we [didn't] pay much attention" to what Bates said because he was a "questionable character." *Id.* at 73.

Surely agents may have reservations about the credibility of various sources of information such as Bates. But here, given his statement, and the earlier corroborating information provided by Yahoo— both in written form and during the course of the six hour January 24, 2002 meeting— the unquestioning perpetuation of the subject fiction is troubling.

B. *Conclusion re Bellavia Search Warrant–Application*

Bellavia has not established, based on the hearing record and the other materials

---

**8.** March 6, 2002 was also the date the search warrant was executed in *United States v. Per-* *ez,* 247 F.Supp.2d 459 (S.D.N.Y.2003).

submitted, that either Binney or Sheldon—with the affiant Berglas acting as an unwitting conduit—intentionally permitted materially false information to be included in the March 1, 2002 warrant affidavit. He has established, however, particularly given the information provided by Yahoo to Sheldon on January 18, and January 24, 2002, that Binney and Sheldon entertained serious doubts about the truth of the "all subscribers received all e-mails" statement as of the date the Bellavia search warrant application was submitted in March of 2002.[9] Accordingly, the erroneous information must be deleted from the warrant affidavit.

6. *Absent the Tainted Information the Search Warrant Application in Bellavia Fails to Establish Probable Cause*

A. *This Court's Prior Decision of May 23, 2003*

▮ By decision dated May 23, 2003, this Court concluded that if the bogus information that every Candyman subscriber received every e-mail was deleted from the search warrant applications of defendants Kunen and Alexander, what remained would be insufficient to establish probable cause.

As noted by the government, "[n]otwithstanding some stylistic differences, the affidavit supporting the search warrant for defendant Bellavia's premises is identical to the affidavit in support of the search warrant in *United States v. Kunen.*" Gov't's June 24, 2003 Letter Br. at 2.[10] Therefore, what the Court said in its May 23rd decision is equally applicable to Bellavia. That earlier decision, slightly modi-

fied to apply to Bellavia, reads in pertinent part:

The application for the search warrant, if stripped of the erroneous information, indicates little about [Bellavia] beyond [his] membership. No information is contained in the application to indicate that [he] downloaded or transmitted child pornography. It is also apparent from the Berglas affidavit that the Candyman website offered members several features, some of which—such as participating in "survey[s]" and "engag[ing]" in real time chat conversations with each other"—constituted lawful conduct. Aff. Supp. Application for Search Warrant ¶ 24.

The remaining representations made to the issuing magistrate judge provided a general profile said to be applicable to a "majority" of those "who collect child pornography." Aff. Supp. Application for Search Warrant ¶ 20. The basis for concluding that membership may be automatically equated with the status of a collector is questionable, particularly in the absence of the pivotal [misrepresentation by Binney] that every member received every e-mail. But beyond that, the idea of a warrant issuing solely upon group probabilities, rather than upon individualized information—a proposition, I believe, to be implicit in some of decisions cited by the government—is troubling. Even if, *arguendo*, a "majority" of Candyman members are more likely than not to have child pornography on their computers at any given time, that does not, standing alone, cause the *entire* membership to be fair game for search warrants. Which is to say, the

---

**9.** Of course, the post March 6, 2002 *information* that Sheldon received from Bates has not been considered in reaching the above determination.

**10.** Although the search warrant applications in *Kunen* and *Bellavia* are in all material respects identical, the warrants were, as noted earlier, executed on different dates. *Supra*, n. 2, 3.

primary focus for probable cause purposes—subject to an arguable exception not relevant here [12]—must be on the individual, as an individual, rather than as a member of a group.

To underscore the type of mischief that adoption of the government's argument would create, consider the following hypothetical: assume that statistics established that "a majority" of incarcerated pedophiles will return to their criminal ways within the first year following their release from prison; assume further that such individuals invariably take one or more items of personal property from their victims and stash those items in their, the pedophiles' residences. From that, it would seem likely that a randomly selected individual from the group (i.e., pedophiles out of jail for over a year) would have engaged in the described conduct. If group probability alone is the appropriate focal point for determining probable cause, then every pedophile fitting the above description would be subject to the government obtaining a warrant for entry into their homes to search for evidence of a crime. No effort would be required to demonstrate to the issuing judge that the targeted suspect falls within the recidivist majority; simply being a member of the group would suffice. Surely such a result may not be squared with Fourth Amendment jurisprudence; in essence, however, that is the implicit gravamen of the government's argument here. *See United States v. Brown*, 951 F.2d 999, 1003 (9th Cir.1991)("proof of mere membership, without a link to actual criminal activity, [is] insufficient to support a finding of probable cause."); *United States v. Rubio*, 727 F.2d 786, 792–93 (9th Cir.1983)(without more, membership in Hell's Angels does not establish probable cause that defendant was involved in criminal activity).

In sum, I agree with Judges Chin [in *United States v. Perez*, 247 F.Supp.2d 459 (S.D.N.Y.2003) ] and Perry [in *United States v. Strauser*, 247 F.Supp.2d 1135 (E.D.Mo.2003) ]: the application for the search warrant, absent the erroneous information about all members receiving all e-mails, is insufficient to establish probable case as to [Bellavia].

May 23, 2003 Mem. and Order at 7–9.

### B. *Post–May 23, 2003 Decisions on the Subject Issued by Fifth and Tenth Circuits*

The essentially template search warrant applications submitted throughout the country have produced numerous decisions bearing on the issue of whether the expungement of the erroneous information furnished by Binney strips the application of probable cause. The Second Circuit has not had the issue squarely presented as yet. *United States v. Schmidt*, 96 Fed. Appx. 41, 2004 WL 962929 (2d Cir. May 3, 2004).

The Fifth Circuit in *United States v. Froman*, concluded that "[b]ecause the affidavit supports the finding of probable cause even without the alleged false statement, we affirm the district court's denial of Froman's suppression motion." *United States v. Froman*, 355 F.3d 882 (5th Cir. 2004). In reaching that conclusion, the Circuit found that "[t]he magistrate was entitled to infer from the affidavit that the singular purpose of Candyman was to trade pornography among its members." *Id.* at 890. The Circuit agreed "with the district court that it is common sense that

**12.** In *United States v. Acosta*, 110 F.Supp.2d 918, 933 (E.D.Wis.2000), the court held that membership in the Latin Kings, the activities of which were characterized as "in effect wholly illegitimate," was sufficient to establish probable cause.

a person who voluntarily joins a group such as Candyman, remains a member of the group for approximately a month without canceling his subscription, and uses screen names that reflect his interest in child pornography, would download such pornography from the website and have it in his possession." *Id.* Later, in rejecting Froman's argument which seemingly parallels the argument advanced successfully in *Perez* and *Strauser*, the Circuit moved away from its "singular purpose" language, and speaks of the "predominant purpose" of the group, as delineated in the search warrant application, as being sufficient to establish probable cause.

A fair reading of the carefully crafted decision in *Froman* indicates it rests upon the proposition that the nature of the group is such that it is more probable than not that a member of the group will possess child pornography.

The same conclusion was reached by the Tenth Circuit in *United States v. Hutto*, 84 Fed.Appx. 6, 2003 WL 22890954 (10th Cir. Dec.9, 2003). The holding in *Hutto*, like *Froman*, is grounded on the proposition that, given the nature of the group, there is probable cause to believe that child pornography will be found on the computer of each group member. Ergo, since Hutto (like Froman) falls within that group, probable cause was found to be present. *Hutto*, 84 Fed.Appx. 6, 7, 2003 WL 22890954 at *1 ("these facts show that the group's clear purpose was to share child pornography, that the defendant voluntarily became a member of the group, and the images containing child pornography were available to all members. It is the view of this Court that this evidence provided a sufficient basis for the magistrate judge to conclude that there was a fair probability that child pornography would be found at the defendant's residence or on his computer.").

For the reasons previously provided (*supra* at), this Court respectfully disagrees with the rationale underlying the decisions in *Froman* and *Hutto*. Accordingly, a perusal of those two post-May 23, 2003 decisions has not altered my belief that the pruned search warrant application in *Bellavia* was inadequate to justify the search of his home.

### 7. *Motions to Suppress of Kunen and Stephens*

■ The Bellavia search warrant was executed on March 6, 2002. However, the Kunen and Stephens warrants were executed on November 16, 2001. During that interim period, i.e. from November 16, 2001 to March 6, 2002, the previously detailed significant events of January 18, 2002 (Sheldon's receipt of Yahoo records indicating that 2740 of the total membership of 3213 elected the "No Mail" option) and of January 24, 2002 (regarding Sheldon's six hour meeting with two Yahoo representatives) occurred.

The actions of Binney and Sheldon prior to November 16, 2001 might well be categorized as negligent or reckless. But, of course, neither, by itself, satisfies the *Franks* standard. To meet that standard, movants need to demonstrate either (1) that the agents knowingly provided false information to the issuing judge, or (2) that the agents had significant reservations about the truthfulness of the all members/all e-mail representations contained in the search warrant applications.

None of the movants has established to my satisfaction that Binney and/or Sheldon intentionally provided material false information. Therefore, only the second of the two disjunctive *Franks* standards remains viable. Bellavia has satisfied that standard with the reference point being the March 6, 2002 search warrant execution date. However, once the previously de-

scribed events of January 18th and January 24th, 2002, are culled from the analysis—as they must be based on November 16, 2001, execution date of the *Kunen* and *Stephens* warrants—what remains is inadequate to warrant the relief requested.

As to Kunen and Stephens, therefore, the misinformation, under *Terry*, remains in the search warrant affidavits. The intact affidavits more than suffice to establish probable cause.

8. *Alexander's Motion to Suppress*

During oral argument on August 28, 2003, the government proffered that "as to Mr. Alexander, not to any of the other defendants here [viz. Bellavia, Kunen and Stephens]; that the fact that he [received] e-mails, ... is actually true." Aug. 28, 2003 Tr. Hr'g at 42. From this, the government maintains that since the information in the search warrant application proved to be accurate, albeit with the power of post-search hindsight, the warrant is immune from a *Franks* attack. That argument is, to say the least, unpersuasive. Yet, it need not be further addressed. The warrant in *Alexander* was executed on the same date as Kunen's and Stephens's, November 16, 2001. Accordingly, what was said in denying the latter two defendants' motions to suppress is equally applicable to Alexander. The government's alternate argument in opposing the relief sought by Alexander is thus academic.

### CONCLUSION

For the reasons indicated, the motion to suppress the fruits of the search conducted of defendant Bellavia's home on March 6, 2002 is granted. The motions of defendants Kunen, Alexander and Stephens concerning the searches of their respective homes on November 16, 2001 are denied.

Kunen, Alexander and Stephens are directed to appear for a conference on Friday, July 9, 2004 at 2:00 p.m., for the purpose of scheduling a trial date.

SO ORDERED.